## THE ENERGIA.

### CROSHAW v. PHILLIPS et al.

### SAME v. INSURANCE CO. OF NORTH AMERICA et al.

(Circuit Court of Appeals, Second Circuit. March 5, 1895.)

1. COLLISION—STEAM AND SAIL IN CHANNEL—RULE 21.

A steamer outward bound from New York *held* in fault for collision with a schooner, in that she violated Rule 21 of the rules of navigation (Rev. St. § 4233), by going down the Cut Channel close to the easterly side, under conditions of wind and tide causing a strong current to set easterly across the channel, whereby she became unable to reverse soon enough because of her liability to drift ashore. 56 Fed. 124, affirmed.

**2. SAME—CROSSING COURSES—SIGNALS.**
The failure of a schooner to hear the whistles of an approaching steamer, seen several miles off, *held* not to have contributed to the collision, because the vessels were on crossing courses, and the duty of the schooner was to keep her course, whether the steamer was, by whistle, signifying an intention of going ahead or astern of her.

**3. SAME—CHANGE OF COURSE BY SAIL.**
Change of course by a schooner on crossing courses with a steamer *held* not to have placed her in fault, as it was shown to have been made long before any risk of collision was involved, and could in no way have operated to confuse, mislead, or obstruct the navigation of the steamer. 56 Fed. 124, affirmed.

**4. SHIPPING—BILL OF LADING—EXEMPTIONS FOR NEGLIGENCE—VALIDITY—PUBLIC POLICY.**
In respect to bills of lading executed at a time when the law, as announced by the supreme court, declared stipulations against liability for negligent navigation to be void as against public policy, there is no force in a contention that the act of February 13, 1893 (27 Stat. 445, § 3) was practically a declaration that the public policy of this country was otherwise; for this change in the law could have no retroactive effect.

**5. SAME—FOREIGN LAWS—CHARTER AND BILL OF LADING.**
A stipulation in the printed form of a bill of lading that the carrier's liability is to be determined by the laws of England, even if valid, is ineffective, where the instrument was given under a charter which contained no such clause, and the evidence shows that there was no intention of making a different contract by the bills of lading from that in the charter party

**6. SAME—DAMAGE TO CARGO—AVERAGE CHARGES IN FOREIGN PORT.**
A cargo owner may recover from the ship, as damages for a negligent collision in American waters, average charges by reason of the collision, legally assessed against his cargo in the foreign port of destination, according to the law there prevailing. 61 Fed. 222, affirmed.

Appeal from the District Court of the United States for the Southern District of New York.

These were two libels against the steamship Energia (George Croshaw, claimant) to recover losses arising from a collision with the schooner Wild Pigeon, in the Cut Channel, in the lower bay of New York. The first was filed by William H. Phillips and John Phillips, owners of the schooner, to recover for damages done to her and her cargo; and the second by the president and directors of the Insurance Company of North America and others against both vessels to recover damages to cargo on board the steamship. The district court entered decrees in favor of the libelants in each case. 56 Fed. 124. It also entered a decree in favor of the libelants in the second case, upon a supplemental libel to recover money exacted from the consignees to cover general average and special charges. 61 Fed. 222. In the first case, appeals were taken by both parties. In the second, the claimant alone appealed.

Harrington Putnam, for the Energia.

Frank D. Sturges, for appellee Phillips.

Wilhelmus Mynderse, for appellee Insurance Co. of North America.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. The Energia was outward bound for Shanghai, China, and moving down the Cut Channel, in the

lower bay of New York. The Wild Pigeon was bound eastward from South Amboy. Her intention was originally to go up through the Narrows, and out by way of the Sound; but, upon a more favorable turn of the weather, her master concluded to go out by way of Sandy Hook, in consequence changing direction several points to starboard of his previous course. The vessels came together close to red buoy C No. 4, on the easterly edge of the channel. The faults charged against the schooner are: (1) No lookout; (2) failure to heed the whistles of the steamer; and (3) not keeping course. The steamer, however, was seen when several miles off, and, although some of her whistles were not heard, failure to hear them did not contribute to the collision; since the vessels were on crossing courses, and the duty of the sailing vessel was to keep her course, whether the steamer was by whistle advertising an intention to go ahead of her or astern of her. A change of course by the schooner is conceded, but we concur with the district judge in the conclusion that it was made long before any risk of collision was involved, and could in no way operate to mislead or confuse or obstruct the navigation of the steamer. It is unnecessary to add anything to the discussion which is found in the opinion of the district judge. The manifest cause of the collision was the violation of article 21 by the pilot of the steamer. The Cut Channel is about 1,000 feet in width, with a depth of 30 feet at low water. The Energia was of about 2,000 tons register, 337 feet long, and drawing $23\frac{1}{2}$ feet of water. The tide was about one-third ebb, and the wind W. N. W., under which conditions there is a strong current setting easterly across the Cut Channel. Rule 21 [1] required the steamer, if "it were safe and practicable, [to] keep to that side of the fairway or mid-channel which lies on the starboard side of the ship." There is no evidence even tending to show the impracticability of counteracting the set of the current and the pressure of the wind by the use of a port wheel, and thus coming down the comparatively narrow channel just to starboard of its mid-line, thereby securing a safe position for whatever maneuvers the presence of another vessel might require. Instead of thus navigating, the pilot of the Energia brought her down, hugging the easterly side of the channel so closely that he was, as the district judge finds, unable to reverse sooner than he did on account of his liability to drift ashore on the port side of the cut, or to foul the chain of one of the channel buoys with his propeller. The decree of the district court is therefore affirmed.

Among the cargo of the Energia were 68,838 cases of oil shipped by Carleton & Moffatt, merchants in New York, and insured by the libelants in the second above-entitled action. As a result of the collision, the hold, where a portion of the oil was stowed, was flooded, and a large number of cases were thereby damaged. The steamer returned to New York for repairs. The oil was discharged, and 16,508 cases were found to be in such condition that they could not be carried forward to destination. They were surren-

---

[1] Rev. St. § 4233.

dered to the underwriters, who have settled with the assured for a total loss thereon. There is no question raised on this appeal as to the amount of such loss. The steamer, upon completion of her repairs, proceeded upon her voyage to Shanghai. There, as a condition of delivery of the balance of the shipment of oil, a cash deposit was exacted by the steamer from the consignees to cover general average and special charges, which were subsequently adjusted at $953.11 and $636.06, respectively. The underwriters paid these to the assured, and a claim for them was included in a supplemental libel, and sustained by the district court. 61 Fed. 222. The steamer's agents here, Carter, Hawley & Co., chartered her in New York on November 22, 1892, to Barber & Co., of the same place, and it was under such charter that the oil was shipped by Carleton & Moffatt.

There is a manifest error in printing one clause of the charter party in the transcript of record. As the form of such clause which is set forth in appellant's brief is not objected to by appellees, it may be assumed to be the correct quotation from the original. It contains a statement of agreement that the carrier "shall not be liable for loss or damage occasioned  *  *  * by collisions, stranding, or other accidents of navigation of whatsoever kind, even when occasioned by the negligence, default, or error in judgment of the pilot, master, mariners, or other servants of the shipowners, not resulting, however, in any case from want of due diligence by the owners of the ship, or any of them, or by the ship's husband or manager." Appellant relies upon this as a defense to the action. The cases of Railroad Co. v. Lockwood, 17 Wall. 357, and of Liverpool & G. W. Steam Co. v. Phenix Ins. Co. (The Montana), 129 U. S. 397, 9 Sup. Ct. 469, sufficiently dispose of this point. There is no force in the contention that the act of congress of February 13, 1893, is practically a declaration that the public policy of this country touching such clauses in carriers' contracts is otherwise than as stated in the cases last cited. When this contract was made, in November, 1892, it was made under the law as it then stood, whether that law was found in a statute or in the authoritative decisions of the supreme court, and subsequent changes in such law by act of congress have no retroactive effect.

The case of The Montana, however, expressly reserves for future decision cases where the contract itself expressly provides that any question arising under it should be governed by the law of some specified foreign country; and appellant seeks to bring himself within this exception by reason of the presence in the bills of lading of the following clause:

"(8) The liability of the carrier under this bill of lading shall be governed by the law of England, with reference to which this contract is made."

We are satisfied, however, from the evidence, that the contract was fully expressed in the charter party, which contained no such clause, and that there was no intention to modify that contract in so important a particular merely by making use of a printed form of bill of lading which contained the so-called "flag clause." In fact, the steamer's agent expressly testifies that there was no in-

tention or even any talk about making a different contract in the bills of lading from that in the charter party. This case, therefore, is controlled by the principles enunciated in The Montana.

It only remains to consider the claim to be reimbursed for the general average and special charges exacted from the cargo upon adjustment at Shanghai. Upon this branch of the case, we concur in the reasoning and conclusion of the district judge, as expressed in the following excerpt from his opinion:

"I do not perceive any sound reason, in justice or in common sense, why both ·the general and the particular average charges, to which the residue of the cargo is legally subject in Shanghai, should not enter into the damages to be recovered for 'this collision. The rule of damages here is 'restitutio in integrum' (The Potomac, 105 U. S. 630); and this rule as plainly demands compensation for a charge or expense lawfully imposed upon this sound part of the cargo as for a deterioration or physical injury to another part, when both are equally the direct results of the collision. The loss to the cargo owner is alike in both, and both, upon the stipulated facts, are alike the direct and natural consequence of the collision. It is immaterial that the charge or expense in dispute has to be paid at Shanghai, instead of here, or that it is payable to the shipowner who is in fault, so long as the charge is a lawful one where it arises. If the exaction were an illegal one, no claim for it would arise here, for then it would not be the proper and natural result of the collision, but of a new agency, and an independent wrong, for which an independent remedy must be sought. But by our law, as well as by the English law, all average charges for the voyage are to be determined and adjusted by the law of the place of destination, which in this case was Shanghai, governed by English law. From the moment of collision, therefore, the sound part of the cargo became liable to these average charges, should it ever reach its destination; and, as that destination has been reached, that item of damage has become fixed, and is therefore recoverable here, as one of the direct and necessary legal results of the collision." 61 Fed. 223.

The appellant contends that this conclusion is fallacious, because general average contribution neither arises by the collision nor while in the port of New York, but is the striking of a balance of the entire transactions of the voyage, and is therefore only recoverable at the place of destination, where vessel and cargo are finally separated. This criticism, however, is without force in the case at bar. All the average charges, both general and special, were for expenses incurred as a direct consequence of this collision, unaffected by any of the subsequent transactions of the voyage. The circumstance that they were collected from the cargo only when the voyage was terminated is immaterial. The "contribution" between the various interests—ship, freight, and cargo—may, indeed, be said to arise only when a process of adjustment has determined the amount to be paid by the respective shares. But the necessity of paying out money in order to enable surviving cargo to secure transportation to its original destination in the vessel by which it was shipped arose here. Whether it was paid here in the first instance by the cargo owner himself, or was paid by the shipowner who thereafter repaid himself out of the cargo owner's goods, it was equally an expense which was the necessary result of the collision; it "arose" at the moment of collision; and it is immaterial when it was paid.

The decrees of the district court in both cases are affirmed, with interest and costs.