ERIE & WESTERN TRANSP. CO. v. CITY OF CHICAGO et al.

CITY OF CHICAGO v. ERIE & WESTERN TRANSP. CO. et al.

(Circuit Court of Appeals, Seventh Circuit. January 4, 1910.)

Nos. 1,623, 1,624.

1. NAVIGABLE WATERS (§ 19*)—OBSTRUCTION BY WATERWORKS CRIB BUILT UNDER PERMIT—DUTY TO GIVE FOG SIGNALS.

The city of Chicago built a waterworks crib in the navigable waters of Lake Michigan within the roadstead to and from the port of Chicago under a permit from the War Department, which required that suitable lights and such aids to navigation as might be required by the United States lighthouse establishment should be maintained on the crib. At night during a dense fog the steamer Conestoga entering the harbor came into collision with the crib and was so injured that she sank. At the time the crib had been substantially completed, with a light tower in which a temporary lantern was suspended, which, however, could not be seen on the night in question for a distance of more than about 150 feet. A bell had been in use on the crib as a fog signal, as on the other cribs maintained by the city, but was not sounded on that night. *Held* that in erecting the crib, where it was, the city assumed the obligation to provide thereon suitable fog signals for the protection of navigation, whether specifically prescribed by the permit or the lighthouse board or not; that the nonperformance of such duty by the failure to provide a bell which, as shown by the evidence, could have been heard for a mile or more, rendered the party responsible therefor liable for the resulting damages.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 68; Dec. Dig. § 19.*]

2. NAVIGABLE WATERS (§ 19*)—OBSTRUCTION BY WATERWORKS CRIB—LIABILITY FOR FAILURE TO MAINTAIN FOG SIGNALS.

The crib having been previously turned over by the contractor who built it to the city, which had exclusive possession and maintained the light by its employés, without proof of any reservation in the contract the contractor could not be held responsible for the failure to maintain proper signals.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 68; Dec. Dig. § 19.*]

3. COLLISION (§ 82*)—RULES AS TO SPEED IN FOG—CONSTRUCTION.

Rule 15 of the navigation rules for the Great Lakes (Act Feb. 8, 1895, c. 64, 28 Stat. 648 [U. S. Comp. St. 1901, p. 2890]), which provides that every vessel shall in thick weather go at a moderate speed and on hearing a fog signal ahead slow down to bare steerageway, does not require a vessel to stop in a fog nor to slow down to bare steerageway while progress appears safe, but requires running at moderate speed, commensurate with dangers which are either known or must be anticipated; she having the right to proceed in expectation of compliance on the part of others with the law in respect of fog signals.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 170–174; Dec. Dig. § 82.*

Collision rules—speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532.]

4. NAVIGABLE WATERS (§ 19*)—INJURY BY COLLISION WITH WATERWORKS CRIB—EXCESSIVE SPEED.

A steamer approaching the port of Chicago at night in a fog at half speed, which was at the rate of about 4½ miles an hour, and on the undisputed testimony enabled her to clear another vessel or an obstruc-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tion on a warning received at a distance of twice her length, *held* not in fault because of excessive speed for a collision with a waterworks crib from which no bell was sounded, as she had a right to expect, and which was insufficiently lighted.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 68; Dec. Dig. § 19.*]

5. COLLISION (§ 116*)—SUITS FOR DAMAGES—RIGHT OF VESSEL OWNER TO SUE FOR DAMAGE TO CARGO.

The right of the owner of a vessel as bailee to sue for the benefit of cargo owners for injuries done to their property by others, recognized in the maritime law, does not rest on the measure of liability for carriage and delivery under the bills of lading, and was not affected by Harter Act Feb. 13, 1893, c. 105, 27 Stat. 445 (U. S. Comp. St. 1901, p. 2946), which changes the measure of such liability under conditions named.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 248; Dec. Dig. § 116.*]

6. COLLISION (§ 129*)—DAMAGES RECOVERABLE—EXPENSE OF GENERAL AVERAGE ADJUSTMENT.

In a suit by the owner of a vessel to recover damages for injury to vessel and cargo in collision, the expenses of a general average adjustment paid by libelant are recoverable as a part of the damages.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 283; Dec. Dig. § 129.*

General average, see notes to Pacific Mail S. S. Co. v. New York, H. & R. Mining Co., 20 C. C. A. 357; The Santa Ana, 84 C. C. A. 316.]

Appeals from the District Court of the United States for the Northern District of Illinois.

Suit in admiralty by the Erie & Western Transportation Company against the City of Chicago and the Fitzsimons & Connell Company, and cross-libel by the city. From the decree libelant and the City of Chicago appeal. Reversed on libelant's appeal, and affirmed on respondents'.

Both of these appeals are from a decree in admiralty, adjudging contributory fault and liability against each of the appellants, for damages resulting from a collision of the steamer Conestoga with a waterworks crib, off the port of Chicago. The issues respectively and facts involved are stated in the opinion.

Harvey D. Goulder and F. S. Masten, for Erie & Western Transp. Co.

Charles E. Kremer, for City of Chicago.

Rob't. J. Folonie, for Fitzsimons & Connell Company.

John C. Shaw, for Pratt & Lambert.

F. M. Brown, for British & Foreign Marine Ins. Co. and others.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

SEAMAN, Circuit Judge. The final decree in admiralty from which the present appeals are brought, arose out of a collision of the steamer Conestoga with a waterworks crib, erected by the city of Chicago, in the navigable waters of Lake Michigan, northeasterly of the harbor entrance. The steamer, laden with a cargo of general merchandise and bound for Chicago, was approaching port, after mid-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

night in a dense fog, when she struck the crib and received injuries which caused her to founder before reaching a dock. For recovery of damages to the cargo, the Erie & Western Transportation Company, owner of the steamer, as the representative of cargo interests, filed a libel in personam, charging the city of Chicago, together with Fitzsimons & Connell Company (contractors for erection of the crib) with fault and liability for the disaster; and various cargo owners and insurers subsequently intervened for direct recoveries. On petition of the city, the appellant, Erie & Western Transportation Company, was joined as defendant to such libel; and it thereupon filed a cross-libel, in its own right as owner, to recover damages suffered by the steamer. Issues were joined upon charges and countercharges of fault for the disaster, and the testimony thereunder was heard in open court, resulting in a finding and interlocutory decree, in substance: That the collision arose through joint fault on the part of the city of Chicago and the Conestoga; that the city was chargeable for failure to give audible signals from the crib, and the steamer was chargeable for excessive speed in approaching the harbor in a fog; and that Fitzsimons & Connell Company, as contractors for the crib work, had released possession to the city, and were not answerable under the libel, cross-libel or interventions.

The issues of damages to cargo and steamer were referred to a commissioner, to hear the testimony, ascertain and report the various amounts attributable to the collision, and upon report thereof, with exceptions filed, the final decree was entered. It approves the report, which fixes the aggregate of damages, to the steamer at $25,674.37, and to the cargo at $48,308.51, allows interest at 5 per cent. on the several amounts, and adjudges: (1) Recovery against the city of Chicago, in favor of the cargo representatives respectively, for such cargo damages and interest, with right reserved to the city to recoup one-half thereof "from whatever sum may be due from said respondent, city of Chicago," to the owner of the steamer; (2) recovery against the city and in favor of the Erie & Western Transportation Company, as owner of the steamer, for one-half of the amount (including interest) fixed for damages of the steamer, subject, however, to recoupment as above provided; (3) that the respondent, Fitzsimons & Connell Company, "be dismissed with its costs;" and (4) that each of the present appellants pay one-half of the costs of suit.

In No. 1,623, Erie & Western Transportation Company appeals from this decree, contending that the trial court erred, primarily in the finding of negligence on the part of the steamer and rulings predicated thereon; also assigning error for dismissing Fitzsimons & Connell Company and for excluding certain claims from allowance. In No. 1,624, the city of Chicago appeals and assigns error on various rulings, with its main contentions: (a) That negligent navigation of the steamer was the sole cause of the collision; (b) that erection of the crib, as located, was authorized by the War Department, without requiring signals to mark its presence, and sufficient warning was furnished in fact by a signal light; and (c) if other signals were needful, the contractors, Fitzsimons & Connell Company, had not completed their contract and were alone chargeable thereunder for any fault.

Both appeals are presented in a single record, were submitted together in briefs and oral argument, and such material questions as arise for solution under either appeal are considered in this opinion; and they are taken up in the order which seems to us preferable, irrespective of the order of their presentation in one and the other appeal.

1. In the nature of the case, the primary inquiry is whether an actionable neglect of duty is established, in the undisputed failure of either respondent named in the libels to give audible signal from the crib while it was enveloped in fog. This waterworks crib was located, under authority from the War Department, in navigable waters of Lake Michigan and within the roadstead of commerce to and from the port of Chicago; was erected (under contract) on behalf of the city of Chicago, in circular form, 112 feet in diameter, with masonry work extending 27 feet above the water level and banded with steel. It was surmounted by one-story brick buildings and a steel light tower about 60 feet in height. At the time of the collision, the structure was completed, except in minor particulars, and was occupied by a cribkeeper and workmen, all employed by the city and asleep in their quarters. A temporary lantern was in use for a signal light, was lighted and suspended in the tower, and no other signal was displayed or given to mark the location of the crib.

The Conestoga was approaching the harbor entrance, on her regular course from Milwaukee, about midnight, in a dense fog, when the crib light above mentioned was sighted by her lookout, "almost ahead and very close aboard," giving the first warning of proximity of the crib. As the steamer was then within about 150 feet of the crib—less than her length away—efforts to avoid collision, by putting the helm hard astarboard and reversing the engine, were unavailing. The testimony is substantially undisputed that the light was insufficient to be discoverable sooner in the fog then existing, and that 150 feet was the utmost distance the location of the crib could then be observed. We believe this warning to be plainly insufficient to enable a steamer of the class of the Conestoga (265 feet in length), running at her lowest practicable speed for fair control and headway, to clear the crib, thus standing directly ahead. To meet such contingency, therefore, was it the duty either of the city or contractor to provide signals of longer reach?

The War Department "permit," in evidence, is the only authorization for locating the crib in navigable water (Act July 13, 1892, c. 158, § 3, 27 Stat. 110), and it provides, as a condition of allowance:

"That suitable lights and such aids to navigation as may be required by the United States Lighthouse Establishment shall be maintained on the crib."

In the testimony for the city, it is stated by the engineer in charge of the work that no signals were prescribed by the Lighthouse Establishment; and it is contended, thereupon, that none were required under the circumstances—in effect, that the structure was a lawful obstruction, through the permit (recognized by statute), and no duty arose for protection of navigation until means therefor were expressly named and ordered. Whatever may be the force of statute and permit by way of authority to maintain the crib, this contention is without sanction, as we believe, in any reasonable view either of the provisions referred

to, or of the well-recognized paramount rights of commerce to use navigable waterways and have needful warnings to guard against obstructions placed therein.

The crib was a structure so placed for the purposes of the city, and with its creation the obligation was assumed to provide such means of warning as were well-known requirements for the protection of navigation, when darkness, fog, or thick weather prevented reasonable observation of the structure from an approaching vessel; and this with or without specific directions in the permit or elsewhere. While a light was needful (and so recognized on the part of the city) to mark the location at night, it is established, both by testimony in this record and by precedents, that lights are ineffectual for fog signals, and that bells or other sounding means are the imperative and customary requirements for fog and thick weather signals. Moreover, the evidence further shows: That bells have long been provided and used as fog signals on all of several other cribs maintained by the city of Chicago in Lake Michigan; that each can be heard, when sounded in a fog, at a distance of a mile or more; that such a bell was for several months in place on the crib in controversy and used as a fog signal; that for some unexplained cause this bell was taken from its mountings, prior to the night of the collision and put out of use.

We are satisfied, therefore, that placing and maintaining the crib as located involves an obligation to provide thereon and give suitable fog signals when needful for safe navigation; that the collision in controversy arose through nonperformance of such duty; and that the party responsible for the failure is answerable for resulting damages.

2. Under each appeal error is assigned for releasing the contractor, Fitzsimons & Connell Company; the appellant city contending that any negligence charged in the libel or cross-libel is attributable alone to such contractor, under the terms of the contract let by the city, and that the contractor is, either alone or primarily, answerable for any damages arising therefrom, while the appellant Erie & Western Transportation Company avers right to a decree against both respondents under the cross-libel.

Both contentions impress us to be without merit under the undisputed facts in evidence, namely, that the crib was in the actual and exclusive possession of the city, in charge of its cribkeeper and occupied by its employés, who attended to the light as above mentioned; all representatives of the contractor having left the crib in such possession some time before. No proof appears of reservation or understanding between the city and the contractor that the contractor was to attend to the signals after such removal; nor are other circumstances in evidence to authorize a decree against Fitzsimons & Connell Company in the present action. We believe, therefore, that neither of the various propositions pressed in the argument on behalf of the city of Chicago, as ground for relieving the city from liability for the collision, and charging the contractor therewith, either wholly or primarily (if fault appears), requires discussion under the above-mentioned state of facts; and that error is not well assigned for dismissal of the contractor.

3. The only issue which impresses us with difficulty in its solution under the findings and testimony is that in reference to moderation of

the speed of the Conestoga, in approaching port through the fog—whether the steamer was proceeding with the caution her navigator was bound to observe in such weather and locality, at the time the crib-light was sighted.  On the part of the steamer, it is contended that the fog came on about half an hour before the collision and the engine was immediately checked down to half speed, and so remained, keeping the steamer at a speed not exceeding 4½ miles an hour, up to the moment the light was made; and the direct testimony of the master, two engineers, mate, wheelsman, and lookout (all on duty) concurs in support of this view.  For the appellant city, however, the contention is, not only that half speed would be excessive under the circumstances, but that the engine was not checked, and full speed was kept up constantly, in violation of the rules of navigation, both statutory and well recognized; and the testimony of two firemen, who were on the steamer, together with circumstantial and opinion evidence, is relied upon for this theory of unchecked speed.

The opinion of the district judge states these deductions from the testimony: That the steamer "did somewhat exceed" the 4½-mile rate claimed, and "was going at a rate faster than was necessary to maintain steerageway, and greater than was justifiable"; that, "had she slowed down to her lowest steerageway gait, the accident might have been, to a great degree, avoided by prompt action."  In our understanding of the opinion, the issue of fault in navigation of the steamer, as found by the trial court and adjudged by the decree for division of the damages, was not the one above referred to (separately raised by the city), that the steamer kept up ordinary (full) speed in the fog.  The disputed fact of checking down and moderating the speed is conceded (inferentially at least) in the opinion, and the finding that the speed then exceeded the requirements for steerageway, and was therefore immoderate, was one of mixed law and fact as to the sufficiency of the moderation under the authorities; was limited to the issue thereupon, and leaves the other issue (of fact alone) undetermined.  The credibility, however, of the testimony on the part of the steamer, that she was running under checked speed, is fairly challenged by the appellant city, with opposing evidence; and if well supported this view is decisive of the issue (purely of fact) of violation of the statutory rule to moderate speed when navigating in a fog.  So, the contentions thereupon are first considered.

These facts are undisputed:  The Conestoga left Milwaukee, bound for Chicago, and was on her course out of Milwaukee at 4 p. m.  Her ordinary speed was 9 miles an hour.  The weather was fine up to midnight, so that the usual course was made, at about that rate, until the fog came on and became dense at 12:25 a. m.  Continuing her course in the fog with both master and mate on watch and a vigilant lookout at his station, the criblight came into view at 12:55 a. m., at a distance ahead less than the steamer's length, and the collision ensued.  In support of the claim that the engine was checked down to half speed, under signal from the master at 12:25 a. m., and was so kept throughout the intervening half hour, all officers and men (six witnesses) having part or concerned in the running testified positively; and their testimony as to the fact of such order, checking down, and actual modera-

tion of speed, without change until the light was sighted—laying aside for the moment their estimates of the rate of reduced speed—impresses us to be entirely credible. The only evidence contra purporting to be direct is the testimony of two firemen, who were on the steamer— one on duty in the firehold and the other off duty in his berth—and each states, in substance, that no signal to check was noticed by the witness, and their regular speed was kept up. It is obvious that such testimony cannot outweigh that above mentioned. The circumstantial and opinion evidence relied upon are also insufficient, as we believe, to discredit the testimony of the steamer witnesses, and the contentions thereupon may well be dismissed in a brief summary: Various ingenious calculations of the run from Milwaukee are submitted, based on estimates of distances between the points of the course and the hours of run above stated, at uniform speed of nine miles an hour, and on certain records of revolutions of the engine shown by the "counter," neither of which is satisfactory to impeach the direct testimony referred to; and neither the evidence of injury to the steamer, caused by the impact with the mason work of the crib, nor the opinion testimony offered therewith, is convincing upon the issue of rate of speed. We are of opinion, therefore, that moderation of speed is proven, and are thus brought to the inquiry whether the finding of insufficient moderation, under the circumstances, is justifiable.

The dangers attending navigation in thick weather have given rise to innumerable opinions in admiralty, defining and enforcing rules of caution which were violated in the case under consideration; and many of these are cited in the arguments upon the question of moderate speed in the case at bar. As stated, however (in reference to collision in a fog, between a steamer and sailing vessel), in The Colorado, 91 U. S. 692, 702, 23 L. Ed. 379:

"Great difficulty would attend any effort to define, with mathematical precision, what is a moderate speed in any particular case, further than to say that the speed ought not to be so great that the steamer cannot perform the duty imposed upon her by the act of Congress to keep out of the way of the sailing vessel, if the latter has in all respects complied with the rules of navigation."

Conditions are so various, in the classes of vessels, in their ability to stop or maneuver, and in particular perils involved, that no specific minimum or maximum rate can be prescribed; and we believe no useful purpose will be subserved by citation or review of the authorities called to our attention and examined.

The rule of navigation established by statute which the appellant city relies upon is the controlling provision, and it reads:

"Every vessel shall, in thick weather, by reason of fog, mist, falling snow, heavy rainstorms, or other causes, go at moderate speed. A steam vessel hearing, apparently not more than four points from right ahead, the fog signal of another vessel, shall at once reduce her speed to bare steerageway, and navigate with caution until the vessels shall have passed each other." (Rule 15, Act Feb. 8, 1895, c. 64, 28 Stat. 648 [U. S. Comp. St. 1901, p. 2890]).

The Conestoga was on the usual course to Chicago, in mid-November, making for port, in calm weather except for the heavy fog, with her engine under check, as we believe, moderating her speed approximately one-half (4½ miles an hour), keeping vigilant watch for ex-

pected fog bells from the crib when within safe distance, or fog signals from other vessels bound up or down. It is uncontroverted that the steamer so running could avoid the crib (and as well clear any vessel in her course), on warning received at a distance of twice the length of the steamer (say 530 feet), either by use of the helm or by reversing the engine; and that the usual fog warning signal can readily be heard and located at much longer distance. "Perfect security under such circumstances is impossible," as danger attends the vessel, whether she stops on her course or proceeds on her voyage at any rate (The Colorado, ante); and the rules prescribed thereupon must be strictly observed by all navigators. The navigator is entitled to proceed in expectation of compliance on the part of others with the law in respect of fog signals, as recognized in the second provision of the above-quoted rule, and declared by the authorities. Casement v. Brown, 148 U. S. 615, 626, 13 Sup. Ct. 672, 37 L. Ed. 582; The Victory and The Plymothian, 168 U. S. 410, 429, 18 Sup. Ct. 149, 42 L. Ed. 519.

We believe the rule intends and provides for cautious running by a steamer during a fog (instead of stopping in her course), when navigating the open waters of the ocean and Great Lakes and thus having ample way for clearance when warned of danger. Its regulation for that great commerce is adapted to the means and methods of the present day, and may not be in harmony with methods and authorities of earlier times and other conditions, when fog signals were neither required in all instances nor relied upon. Navigators of steam vessels upon these waters are expected to make their trips with comparative regularity in weathers fair or foul, and warning signals for thick weather and fog are prescribed in that view. The rule, therefore, requires moderate speed for running in the fog—the rate to be commensurate with dangers which are either known or must be anticipated —neither requiring the steamer to lie by in her course, nor to slow down to "bare steerageway" while progress appears safe. It expressly directs the last-mentioned provision in the event of hearing a fog signal ahead—not for fog alone in the absence of warning. Doubtless other contingencies may demand either stopping the engine or slowing down to the lowest rate consistent with helm control, and literal compliance with the rule, by moderating speed in such instance, may not escape condemnation for fault in navigation—as no such provision can be applied to all conditions.

In the instant case, however, no circumstance appears in evidence, and none is called to our attention by counsel, which impresses us, either as an exception from the general rule of moderate speed, or as authorizing condemnation for running at half speed. The presence of the crib in the course was the only obstruction in evidence to be apprehended, and fault is not attributed to the master, for believing and proceeding in the belief that a fog bell would be sounded from the crib in such weather. Reduction of speed to bare steerageway was neither needful to escape collision with the crib, after warning was given therefrom by the fog bell—which was on the crib, but not in use, although supposed to be sounding—nor required by the rule. The proof that the expected bell could be heard a mile or more away and readily

178 F.—4

located, and that notice at a distance of less than 600 feet would be ample to clear the crib, at the rate the steamer was running, establishes, as we believe, that fault for the collision is not attributable to navigation of the steamer, either for the rate of her approach or otherwise.

We are of opinion, accordingly, that the failure on the part of the city of Chicago to give a warning fog signal from the crib was the sole fault and cause of the collision, and that the decree is erroneous in so far as it is inconsistent with the foregoing view.

4. The appellant Erie & Western Transportation Company also assigns error: (a) For overruling exceptions to the report of the commissioner disallowing sundry claims submitted on its behalf; and (b) for the recoupments granted by the decree in favor of the city. As the provisions for recouping damages are in effect set aside by the foregoing ruling, that assignment requires no discussion. In reference to the disallowances by the commissioner, no error is well assigned for items numbered 1, 2, 3, and 5; each involving inquiries of fact, for which the evidence is neither preserved in the record, nor covered by the report or stipulations of record. The remaining item (No. 4) relates to allowance of recovery in favor of cargo owners for the expenses of general average adjustment, instead of recovery by this appellant. As the fact of payment by the appellant as found by the commissioner and the ruling referred to against the appellant appears to rest alone on the premise of fault in navigation which we do not uphold, such ruling is reviewable. If the expense of adjustment is recoverable (as hereinafter considered), payment thereof entitles the appellant to recovery from the city, irrespective of equities therein (not here involved) to be adjusted between the appellant and cargo owners; and we believe the decree is erroneous and requires modification in conformity with this view.

5. The only other questions raised, upon which a ruling is required on these appeals, are assignments on behalf of the city which are embraced in two propositions: (1) That the owner of the steamer is without authority to represent cargo owners for recovery of their damages; and (2) that expenses and fees allowed for making the general average adjustment were not recoverable against the city as part of the damages.

(1) While the major portions of cargo interests were ultimately represented personally, through interventions, the owner of the steamer, as the original libelant, was recognized by the decree as trustee for other interests, not so intervening; and recovery therefor was awarded accordingly. The only present materiality of the first proposition, therefore, is in respect of damages thus awarded in the name of the assumed trustee. It is contended that the provision known as the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]), relieving the carrier from liability to shippers for losses arising out of fault in navigation under conditions named, so changes the relation theretofore existing between carrier and shipper that the case of Commander in Chief, 1 Wall. 43, 51, 17 L. Ed. 609, and other authorities cited, upholding such right of representation, are no longer applicable.

In the maritime law, however, we understand this duty and right of representation to be well settled in respect of all cargo interests, up to delivery of the shipment, inclusive of the right, as bailee, to sue for the benefit of cargo owners, for injuries caused by others to their property. The Beaconsfield, 158 U. S. 303, 307, 15 Sup. Ct. 860, 39 L. Ed. 993. Whether this duty arises either out of the special nature and hazards of the service or general doctrine of bailment, we believe it does not rest on the measure of liability for carriage and delivery under the bill of lading, and that the duty in question to care for all cargo interests involved in any disaster or injury (and consequent right of representation for their protection) remains unaffected by the act referred to.

(2) For allowance of the expenses of a general average adjustment, as part of the damages arising from the collision and recoverable under the libel, no rule appears to have been adopted in this circuit. But the duty of master or owner to have such adjustment made, for the benefit of all concerned, is unquestionable; and we believe the rule upheld in the Second Circuit, in The Energia, 66 Fed. 604, 608, 13 C. C. A. 653, to be well founded. The several objections to such allowances in this decree are, therefore, overruled.

On the appeal of the city of Chicago (No. 1,624) from the decree of the District Court, we are of opinion that error is not well assigned, and the decree is affirmed.

On the appeal of Erie & Western Transportation Company, on its own behalf, as owner of the Conestoga (No. 1,623), the decree is reversed, and the cause remanded, with direction to modify the terms and enter a decree in conformity with the foregoing opinion, including costs. The costs of both appeals are to be taxed against the city of Chicago.

NOTE.—The following is the opinion of Kohlsaat, District Judge, in the court below:

KOHLSAAT, District Judge. The libel in this case seeks to recover for damages sustained by reason of a collision with the steamer Conestoga and what is known as the "Carter H. Harrison Crib," situated about 2¾ miles in a northeasterly direction from the Chicago pier. The accident occurred at 12:55 a. m. of November 16, 1899, during the prevalence of a dense fog. The steamer made the trip from Milwaukee to the crib, 82½ miles, in 8 hours and 55 minutes, or an average speed of more than 9½ miles per hour. Her usual speed was 9 miles per hour. There was little or no sea or wind. It apppears from the evidence that the usual lookout and sounding of whistles were observed upon the steamer. When the crib came into view, it was almost ahead, and 150 feet distant from the steamer's bow. The crib was about 112 feet in diameter, and had displayed on its northwest side a light at a height of about 50 feet. This lantern was substantially like the usual anchor light; the glass cylinder being about 7 inches in diameter and having a horizontally corrugated surface, and being of about 80-candle power. No other signal was given.

The superstructure of the crib stood at an elevation of about 27 feet from the water line. There was a bell upon the crib, which had been used during the construction of the masonry of the substructure, but which had not been used, or even mounted, for about three months. Previous to the building of the crib, the city had secured the usual consent of the Secretary of War, as required by law. This provided "that suitable lights and such aids to navigation as may be required by the United States Lighthouse Establishment shall be maintained in the crib superstructure, by the city of Chicago, Illinois, at

its expense." The Lighthouse Establishment took no action in the matter. The steamer struck head on, and was so severely broken that she sunk in about 40 minutes in 20 feet of water. She carried about 1000 tons of general merchandise.

Libelant claims damages to cargo, $67,034.04. Cross-libelant claims damages to cargo, $23,260.09. Libelant insists that the accident was caused through the negligence of the city of Chicago and the contractors in not causing a bell to be rung, or some other audible signal given; that in the condition of the weather a light could not be seen far enough to enable a vessel to avoid the crib; that the Conestoga, at the time she collided, was proceeding under half speed, and had only headway sufficient to give steerageway; that she was entirely free from negligence in the premises; that the collision occurred solely through the fault of the city and its contractors.

The evidence does not sustain the charge that the vessel was unseaworthy, or her machinery in any way defective. Her officers claim that she was checked down to 4.12 miles per hour 30 minutes before she struck. We have, then, a steamer 265 feet long over all, heavily loaded, coming up the lake into the known vicinity of the various obstructions located in the Chicago Harbor, at the admitted speed of 4½ miles per hour, in a fog so dense as to prevent a light being seen at a distance of 150 feet; the light, it must be remembered, upon a superstructure 112 feet in diameter, and at a height of about 50 feet. I am not satisfied, from the evidence, that the speed did not exceed 4½ miles per hour. In my judgment, it did somewhat exceed that rate.

Sailing rule 15 provides as follows: "Every vessel shall, in thick weather, by reason of fog, mist, falling snow, heavy rainstorms or other causes, go at moderate speed. A steam vessel hearing, apparently not more than four points from right ahead, the fog signal of another vessel, shall at once reduce her speed to bare steerageway, and navigate with caution until the vessels shall have passed each other." What is moderate speed must be determined by the circumstances of each case. Every vessel has the right to proceed with speed sufficient to maintain her steerageway. Taking into consideration all the conditions existing at the time of this accident, I am of the opinion that the Conestoga was going at a rate faster than was necessary to maintain steerageway, and greater than was justifiable, and that, had she slowed down to her lowest steerageway gait, the accident might have been, to a great degree, avoided by prompt action on the part of her officers and crew.

The evidence, however, fairly warrants the conclusion that, had some reasonably audible signal been given from the crib, those in charge of the steamer might have sooner made out the crib, and avoided, or at least greatly reduced, the damage caused thereby. There is no evidence of any regulation or established rule prescribing what signals or alarms should be given under circumstances such as obtained in this case. It would seem that the court must be guided by the particular facts of each case. The bell was at hand, and could easily have been made available. If the weather was as heavy and dense as is claimed, to have done so would certainly have been a reasonable precaution.

I am of the opinion that both the vessel and the party or parties in charge of the crib were, under the circumstances, negligent, and by such negligence jointly contributed to the happening of the accident in question. The finding of the court will be that the Erie & Western Transportation Company, owner of the Conestoga, is liable for and decreed to pay one-half of the damages growing out of said collision, and that the other half be paid as hereinafter stated, subject, however, to such modification as may grow out of the application of the so-called Harter act. and the stipulations of the bills of lading.

There remains yet the question as to who is responsible for the negligent omission to give some audible signal from the crib to approaching vessels on the night in question. It appears that the Fitzsimmons & Connell Company took the contract from the city for the construction of said crib, and was required by its contract to protect the city in such case while this structure remained in its possession. The only question I deem it necessary to consider is: "Who was in possession on the night of the collision?" So far as libelant is concerned, the city must be held liable in any case, and this inquiry goes

only to the extent of determining, as between the city and said contractors, which is liable.

There seems to be considerable contention as to whether the contract was entirely performed at the time of the accident. By the contract the work should have been completed by January 1, 1897. If, however, the city had taken possession at the time in question, manifestly the city was the party responsible for the neglect. From the evidence I am clearly of the opinion that the city had possession, and that, at the time of the accident, the Fitzsimmons & Connell Company was not in possession. The mere fact that it did later remove some earth from the base of the crib and bulkheads from the intake opening is of no importance in determining this fact. The city's men, one of them an assistant crib keeper, were on the crib alone. No representative of the Fitzsimmons & Connell Company was there, and the city had taken complete charge and control.

The other half of the damages sustained as above should be charged against the city of Chicago, subject to the modifications, if any, growing out of the terms of said bills of lading.

The matter is referred to Commissioner Lewis F. Mason, to ascertain the damages, and the question of the apportionment thereof will be disposed of by the court when the report of the commissioner is filed.