### GRAY'S HARBOR TUGBOAT CO. v. PETERSEN.

(Circuit Court of Appeals, Ninth Circuit. May 6, 1918.)

No. 3093.

1. TOWAGE ⬦⟞15(2)—INJURIES—EVIDENCE.

Evidence *held* to show that the barkentine of which libelant was master was injured while being towed across a bar by respondent's tug.

2. TOWAGE ⬦⟞11(1)—TOWING VESSEL—RESPONSIBILITY OF.

Where no special contract was made concerning the towing of a vessel across a bar at the harbor entrance, and the captain of a tug did not consult the master of the vessel regarding his movements, the captain was in command of both vessels, and was bound to exercise reasonable skill and care.

3. TOWAGE ⬦⟞11(5)—TOWING VESSEL—DUTY OF MASTER.

Where the captain of a tug undertook to tow a ship across a bar at the harbor entrance, he was bound to know the channel selected, and whether, in the condition of the wind and water, it was proper to attempt the towage.

4. TOWAGE ⬦⟞11(3)—NEGLIGENCE—MISTAKE OF JUDGMENT.

The master of a tug *held* negligent in attempting to tow a vessel across a bar at the harbor entrance by an unmarked channel, etc., so that the owner of the tug could not escape liability, on the ground that the master acted merely under a mistake of judgment.

5. TOWAGE ⬦⟞15(3)—INJURIES—DAMAGES.

Where a ship being towed struck on a bar and was injured through the fault of respondent's tug, expenses for towing the ship to a dock, for

---

⬦⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

docking and repairing, as well as expenses in paying commissions in the securing of a new crew, and for the general average adjustment, were allowable.

**6. Towage ⊗15(3)—Damages—Interest—Allowance.**

Where a tug was liable for injuries suffered by a ship in towage, interest on the amount actually expended in repairs, etc., *held* properly allowed, though, because of libelant's delay in bringing the case on for final hearing, interest was not allowed for the full time between the date of injury and the decree.

Appeal from the District Court of the United States for the Southern Division of the Western District of Washington; Edward E. Cushman, Judge.

Libel by R. Petersen against the Gray's Harbor Tugboat Company, a corporation. From a decree for libelant, respondent appeals. Affirmed.

Morgan & Brewer, of Hoquiam, Wash., for appellant.

McCutchen, Olney & Willard and Ira A. Campbell, all of San Francisco, Cal., and C. H. Hanford and E. C. Hanford, both of Seattle, Wash., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge. The appellee, who was master of the American barkentine Jane L. Stanford, brought on behalf of the owner of the ship and its cargo in the court below the present libel against the appellant tugboat company for damages growing out of the alleged grounding of the ship in crossing the bar at the entrance of Gray's Harbor in the state of Washington, while being towed by one of the company's tugs, named John Cudahy, of which Chris Olson was at the time master. By stipulation of the parties the controversy between them is here limited to the question of the appellant's liability for any damages, and to the right of the libelant to recover certain specified expenses and interest.

It appears from the record that in October, 1910, the ship was at Aberdeen, Gray's Harbor, having on board a cargo of more than a million feet of lumber and bound for Australia. Needing a tug to cross the bar, the appellant furnished her with one for that purpose, but because of the then condition of the weather towed her to an anchorage within the harbor, where she remained storm-bound for about 3 weeks. The draft of the ship, loaded as she was, was 19 feet and 10 inches forward, and 20 feet and 2 inches aft. While at her anchorage, and with her anchors down, the ship was blown on a spit of Sand Island, from which she was pulled within a few hours by tugs of the appellant company, from which time she remained at anchorage for about 12 days awaiting the abatement of the storm. Finally, and in the morning of the 25th day of October, 1910, Capt. Olson, of the appellant's tug John Cudahy, made an examination of the bar with the view of taking the ship out, but, returning, reported to her master, Capt. Petersen, that the conditions were unfavorable. At 1 p. m. of the same day Capt. Olson made a second examination, and,

deeming the bar then "passable," so reported to the master of the ship, and started with the latter in tow at 2:30 p. m. He did not take the usual and best-known channel, which was buoyed, but selected another channel, which he had used a number of times within a year, but which was unknown to Capt. Petersen, although he had been navigating in and out of the harbor for about 6 years. That harbor was Capt. Olson's home port, where he had plied his vocation for about 25 years, and, there being evidence that he was a careful and competent pilot, it must be taken that he was familiar with its waters.

The evidence shows without conflict that at the time he undertook to tow the ship across the bar there was a heavy swell, and that the sea was breaking on it—indeed, it is so admitted in the answer of the appellant. It was from 1 to 2 hours before high tide, and a warning appears to have been given to Capt. Olson that the swell was too heavy by another tug captain of the appellant company, who was preceding him across the bar in the towing of a lighter vessel. Moreover, the evidence shows that as the bar was approached soundings were taken by the tug, which soundings, however, were not shown—a fact we cannot but regard as very significant. But a sounding was taken on the ship which showed 7 fathoms of water, followed by another, just before the ship struck showing 4½ fathoms—the least depth of water found—thereby clearly showing that the sinker there rested on an incline, and within 2 minutes after the ship struck she was in deep water. Obviously, therefore, there would have been only about 2 feet of water under the ship's keel on the crest of the bar had the sea been smooth, instead of which the evidence shows without substantial conflict that there were three great swells encountered right on the bar, which were reasonably to be anticipated, in view of the undisputed knowledge on the part of the tug's captain.

[1] He testified, as did the members of his crew, that no one on the tug saw any evidence of the ship's striking as she crossed the bar, and a number of witnesses on behalf of the appellant gave testimony to the effect that the very serious damage the ship is shown to have sustained was sustained by her when she was blown on the sand spit 12 days before. It is enough to show that that pretension is without any merit whatever to point to the undisputed fact that during all of the 12 days that the ship laid at anchor, after having been pulled from the sand spit, there was only her usual 8 inches of water in her hold, whereas within 20 minutes after striking on the bar the seams of the ship were so opened that water had come in to the amount of 20 inches.

We here insert a few lines from the testimony of Capt. Petersen:

"Q. After sounding the second time, Captain, with a report of 20 inches of water, what did you do? A. Well, at that time we had set all the sails; that is a majority of the sails. We had all our sails set outside of the skysail. I ordered all the small sails clued up and made fast. After they were fast, I sent all hands to the pumps, everybody, mate and all hands, outside of the man on the lookout. We worked two pumps. I could just hold her by working both pumps; we had then 42 inches in her. * * * That same evening, at 11 p. m., I set the ship's course for the Columbia River Lightship. At 11 o'clock the next morning the tug Oneonda picked us up and towed the ship to Astoria. She was anchored there a day and a half, and then towed to St.

Johns and anchored. The next day she was put into the wharf of the port of Portland dry dock and began to discharge lumber. * * * The ship went on the Oregon dry dock. I examined her on the dry dock."

The damages sustained by the ship were thus testified to by 'Capt. Crowe, surveyor for the Marine Underwriters:

"I examined the Jane L. Stanford. I found the vessel, after putting her on the dry dock, to have apparently hit with her heel on a sandy bottom. About 30 feet of the outer shoe and ten feet of the inner shoe on the heel were torn off the whole length; the whole after end of the vessel, extending to about one-third of her length. The vessel was all shaken in the seams; the butts along the bottom and all over the vessel were more or less started; the keel in several places on the places mentioned before, the pieces of shoe split off and in some places cut in deep enough to take off or scalp off the keel. In the vicinity of the foremast, underneath the foremast on the port side there were two pretty deep cuts and the planks bruised and cut in two and a quarter inches deep. The keel right opposite that place was slightly damaged, and the shoe for a distance of about 10 feet badly split up; right across the starboard side of the planks there was one bad bruise, and a score of considerable length; these latter damages were fresh, and had apparently been made by the vessel going upon sharp rocks; also places damaged along the keel to about within 30 feet of her heel; the stern post was found set about one-fourth of an inch in the ship's counter; rudder not working true; steam pumps out order; I think that comprises about the damage."

[2-4] It is not contended that any special contract was made respecting the towing, nor is it claimed that the captain of the tug even consulted the master of the ship regarding his movements. Under such circumstances it is perfectly clear that in the operation the captain of the tug was in command of both vessels and was bound to exercise reasonable skill and care in everything relating to the work undertaken. Being his home port, he was bound to know the channel he selected and whether, in the condition of the wind and water, it was safe and proper to attempt to tow the ship across the bar. The Margaret, 94 U. S. 494, 24 L. Ed. 146; Humboldt Man. Ass'n v. Christopherson, 73 Fed. 239, 19 C. C. A. 481, 46 L. R. A. 264. We fully agree with the court below that the conditions under which the tug acted in the present case were full of peril, and that its action cannot be properly assigned to a mere mistake of judgment of its captain, but was such negligence on his part as rendered the owner of the tug liable for all damages thereby caused to the ship.

[5] Only four items included in the amount of damages awarded by the decree appealed from are contested. The first three—for the expenses of the captain of the ship in getting her towed in and out of the Columbia river, discharging and reloading her cargo, docking, repairing, and like charges, in paying commissions in the securing of a new crew, and for the general average adjustment, all of which were shown to and found by the court below to have been actually and necessarily expended—were, we think, properly allowed. The Energia (D. C.) 61 Fed. 224, affirmed in 66 Fed. 608, 13 C. C. A. 653; Erie & W. T. Co. v. City of Chicago, 178 Fed. 42, 51, 101 C. C. A. 170.

[6] The remaining contested item was for interest for the period of 5 years at 6 per cent. per annum on the amount of money actual-

ly expended by the appellee. It was not error to allow such interest. Wellesley Co. v. Hooper, 185 Fed. 733, 740, 108 C. C. A. 71; The Jeannie, 236 Fed. 463, 474, 149 C. C. A. 515. As seven years intervened between the time of the injury sued for and the date of the decree, the appellee insists that interest should have been allowed for that full period. The court below, however, refused to do so, because of delay in bringing the case on for final hearing at an earlier date. We are unable to hold, upon the record, that there was error in so doing.

The judgment is affirmed.