## Case No. 10,106.

### NELSON et al. v. The GOLIAH.

[Hoff. Op. 481; 2 Am. Law Rev. 772, note.]

District Court, D. California. March 10, 1868.

NEGLIGENT TOWAGE — LIABILITY OF TUG FOR INJURY TO TOW—COLLISION WITH ANCHORED VESSEL—EXCESSIVE SPEED—LENGTH OF HAWSER.

[1. A steamer engaged in towing is responsible to the tow for at least the same degree of care and diligence as she is bound to exercise to avoid injuring other vessels; and hence, where the tow is injured by being brought into collision with another vessel, the question of the tug's liability is to be determined by the same rules applicable in ordinary cases of collision.]

[2. The use of the terms "ordinary negligence," "gross negligence." etc., are of doubtful utility for the purpose of defining liabilities of different classes of bailees, and often tend to create difficulties and embarrassments in practice; and the question, what constitutes actionable negligence depends, after all, upon the circumstances of the particular case.]

[3. Any violation of the general rules of navigation in respect to the course to be pursued by vessels approaching each other or in respect to lookouts, the display of lights, etc., will ordinarily render. the vessel guilty of it liable for the consequences; and, when required by the circumstances, "great caution" and the "utmost vigilance" will be exacted, and "ordinary care" is not sufficient.]

[4. The law exacts the extremest diligence and the highest degree of caution on the part of vessels, especially steamers, navigating frequented waters, where there is danger of collision; nor will it be any excuse that the collision could not have been prevented at the moment it occurred, if measures of precaution have been neglected which would have rendered the accident less probable.]

[5. The rule that, in case of collision between a vessel under way and one at anchor, the burden is upon the moving vessel to show that she was not in fault, applies in its full extent to the case of a tow seeking to recover against her tug damages occasioned by being brought into collision with an anchored vessel, in the course of the towage.]

[6. A tug held in fault. and responsible to the owners of her tow. for collision with an anchored vessel, in that she attempted to run through anchored shipping on a hazy night, with her tow upon a hawser of 50 fathoms. and at a speed of from 7 to 8 miles an hour, when she might have avoided the shipping by taking a different route.]

This was a libel by Charles Nelson and others against the steamtug Goliah for damages sustained in a collision. alleged to be caused by negligent towing.

Milton Andros, for libelants.

T. R. Wise, for claimants.

HOFFMAN, District Judge. On the 2d of January the steamtug Goliah was employed by the master of the schooner Eclipse to tow the latter vessel (then at the entrance of the harbor) to a place of mooring. The libel

avers that by reason of the negligent and unskilful manner in which this service was performed the schooner was brought into collision with the steamer Ajax, and sustained damage, for which this action is brought. It is not contended by the advocate of the libelants that steamtugs or tow boats, while engaged in their ordinary business, are to be held to the rigid accountability of common carriers. It is urged, however, on the part of the claimants, that they are liable for gross negligence only, and two cases from the New York Reports are cited in support of this position. But neither of these cases will be found on examination to sustain the rule contended for. In Alexander v. Greene, 7 Hill, 533, the decision turned upon the effect to be given to a permit or special contract by which the risks of the transportation were assumed by the tow. The supreme court (per Mr. Justice Bronson) held that by this agreement the tug was exonerated from all liability, even for gross negligence. The court of errors reversed this decision. All the judges except one were of opinion that, notwithstanding the permit. the owners of the steamboat were responsible for injuries caused by the want of ordinary skill and care on the part of their agents. A majority even held that they were liable as common carriers; and Mr. Justice Bronson himself admitted that in the absence of an express agreement the law would make them answerable for the want of ordinary care and skill on the part of their servants. In Wells v. Steam Navigation Company, 4 Seld. [8 N. Y.] 375, the same question arose, and was decided on the authority of the previous case in 7 Hill. The case turned upon the construction of the special contract; and the court expressly declares that "under an ordinary contract to perform the service the defendants would be bound to bestow ordinary care and diligence, and would be liable for any injuries occasioned by the want thereof." Page 379.

Judge Story, in his work on Bailments (section 496), states the owners of steamboats employed in towing are not liable as common carriers. but are responsible only for ordinary diligence and care in the undertaking. To the same effect is Ang. Carr. §§ 668–686. In truth, the only question discussed in the cases is not whether tow boats are liable for gross negligence. but whether they are not subject to the full liability of common carriers. In Louisiana they are so considered. Smith v. Pierce, 1 La. 353; Adams v. New Orleans Steam Towboat Co., 11 La. 46. They were also held to be common carriers by Mr. Justice Kane, in Vanderslice v. The Superior [Case No. 16,843]. The decision of the district court in this case was overruled by Mr. Justice Grier in the circuit court. But it is in none of the text-books intimated that the owners of tow boats, who have made the ordinary contract for the performance of the service. are not liable, like bailees for hire,

for the want of the reasonable care and diligence required by the nature of their undertaking, the business they are engaged in, and the circumstances of the particular case. It would be a singular anomaly in the law if the owners of steamtugs, who are confessedly liable for injuries done by their want of skill and diligence to the vessels of strangers with whom they have made no contract, should be held to a less degree of responsibility to the owners of the vessel in tow for the negligent and unskillful performance of a service which they have been paid for undertaking. Whatever difference of opinion may have heretofore existed as to the precise relations between the owners of the tug and those of the tow, whether those of principal and agent, or of master and servant, it is now settled by the supreme court of the United States that the tug is responsible for damages caused to other vessels by want of skill and diligence on the part of her master and crew. And this, though the vessel in tow may, by coming in contact with the other, have been the immediate cause of the damage. Where both vessels are exclusively under the control, direction, and management of the master and crew of the tow, the owners of the tug would not be liable, for the injury could in no sense be said to be caused by the negligence and unskillfulness of themselves or their agents. Where those in charge of the vessels respectively jointly participate in their control and management, both will be liable if the damage was caused by the fault of both, or either, if it arose from his fault alone. Sturgis v. Bowyer, 24 How. [65 U. S.] 110; Cushing v. The John Fraser, 21 How. [62 U. S.] 184; Sproul v. Hemmingway, 14 Pick. 1; The New York v. Rea, 18 How. [59 U. S.] 223; The Express [Case No. 4,596]; The Carolus [Id. 2,424]; The R. B. Forbes [Id. 11,-598].

These principles, so agreeable to justice and common sense, must be considered as authoritatively established; and assuming, as we must, that the liability of the tug to the vessel in tow for injuries occasioned by her negligence is at least coextensive with her liability to stranger vessels for injuries similarly caused, the inquiry in this case becomes in no respect distinguishable from the ordinary inquiry in collision cases,—by whose fault did the accident occur? We are thus relieved of the necessity of considering whether the tug has performed the service with ordinary or with slight diligence, or whether she has been guilty of gross or of "ordinary negligence," whatever this last expression may mean. In truth, these terms, borrowed from the civil law, and common in the text-books and judicial opinions, appear to have but doubtful utility for the purposes of defining liabilities of different classes of bailees.

The question in all cases is: Has there been such negligence as will render the party guilty of it responsible? Whether such negligence has occurred will depend on the re-lations of the parties (e. g. whether a bailment be gratuitous or for pay), the nature of the service, and all the other circumstances of the case. In Wilson v. Brett, 11 Mees. & W. 113, Rolfe, B., observes that "he could see no difference between negligence and gross negligence; that it was the same thing. with the addition of a vituperative epithet." In Wyld v. Pickford, 8 Mees. & W. 460, Parke, B., says: "That a carrier, under certain circumstances, has in many cases been held responsible for gross negligence; but in some of them that term has been defined in such a way as to mean 'ordinary negligence' —that is, the want of such care as a prudent man would take of his own property." The use of the expression "ordinary negligence" to signify the want of ordinary diligence seems not particularly happy; nor does it afford any certain or precise measure of the degree of diligence to be exacted in any class of cases, since that must depend, as before observed, upon all the circumstances of each particular case. The degree of diligence required of a bailee is usually said to depend upon the question whether the bailment was gratuitous or for compensation, and whether for his or the bailor's exclusive benefit. But that this distinction affords no certain test of what shall be deemed "negligence" is shown by the case of Wilson v. Brett already cited. In that case a person known to be skilled in the management of horses was held liable for failing to exercise such skill as he possessed. although the injury occurred while he was riding a horse gratuitously. at the owner's request, to show him for sale. So, too, in the case of The New World v. King, 16 How. [57 U. S.] 469, it was held that a passenger carried gratuitously has the same right of redress as other passengers for injuries caused by the negligence of the carrier. The court, it is true, abstains from declaring that the obligations of a carrier to a gratuitous passenger are "precisely the same in all respects" as to other passengers. but it holds that. even in regard to the former, he is held to the "greatest possible care and diligence." The court further expresses, in very forcible language. its doubt whether the terms "slight," "ordinary," and "gross." used to describe different degrees of negligence. can be usefully applied in practice, and it remarks "that judges have recently expressed their disapprobation of these attempts to fix the degree of diligence by legal definitions. and have complained of the impracticability of applying them." It is added "that some of the ablest commentators on the Roman law. and on the Civil Code of France. have wholly repudiated the theory of three degrees of diligence as unfounded in principles of natural justice, useless in practice, and presenting inextricable embarrassments and difficulties." If a mechanic or professional man undertake a service. he could hardly excuse himself for the want of that skill and diligence which he holds him-

self out as possessing, on the ground that he was not to be paid for his services. Nor would a bank, which has received gratuitously a special deposit from a customer, be excused by that fact from the duty of taking the same care of it as of its own funds. But perhaps the most striking illustration of the uselessness of the test supposed to be afforded by the gratuitous or non-gratuitous character of the service is furnished by the admitted rule in collision cases. In these cases the parties have no relations to each other growing out of contract, express or implied. Their only relations arise from the reciprocal duty of so using one's own as not to injure another. But the inquiry in these cases is, was the libelled vessel in fault? If so, or if, in other words, she has been guilty of negligence, she is responsible. What constitutes negligence in a particular case depends upon its circumstances. Any violation of the general rules of navigation in respect to the course to be pursued by vessels approaching each other, or in respect to look-outs, the display of lights, etc., etc., will ordinarily render the vessel guilty of it liable for its consequences; where required by the circumstances, "great caution" and the "utmost vigilance" will be exacted; "ordinary care" is not sufficient. Culbertson v. The Southern Belle, 18 How. [59 U. S.] 585; The Scioto [Case No. 12,508]; Rogers v. The St. Charles, 10 How. [60 U. S.] 108; Ward v. The Fashion [Case No. 17,-154]; Ang. Carr. § 650. And yet the obligation of the rule, "Sic utere tuo ut non alienum laedas," would generally be stated to be the duty of exercising reasonable and ordinary care in the use of one's own to avoid injury to another. But under special circumstances extraordinary care is only reasonable diligence, the want of which creates the liability. Thus the duty of exercising ordinary care and diligence becomes, in effect, the duty of exercising extraordinary care and "great caution"; and this apparent paradox illustrates the difficulty of attempting to define in advance, by qualifying epithets, what shall constitute that negligence in any particular case for which the guilty party would be responsible.

With respect to the caution and vigilance to be observed by vessels entering a harbor or navigating waters where other vessels are likely to be encountered, the rules established by the decisions are very explicit. "When a steamer is about to enter a harbor, great caution is required. There being no usages to an open way, the vigilance is thrown upon the entering vessel. Ordinary care under such circumstances will not excuse a steamer for a wrong done." Culbertson v. The Southern Belle, 18 How. [59 U. S.] 587. "If they (propellers) take other craft in tow, those in charge of them ought to augment their vigilance in proportion to the embarrassments they have to encounter." New York & B. Transportation Co. v. Philadelphia & Savannah Steam Nav. Co., 22 How. [63 U. S.] 472. "It

may be safely stated as another general rule admitting perhaps of no exception, that a vessel entering a harbor in the night time is put on her utmost vigilance. * * * When there is reason to expect that the harbor may be crowded with vessels the utmost vigilance is required." The Scioto [supra]. "Inasmuch as the schooner was in a place much frequented as a harbor, in stormy weather, and of which the steamer was chargeable with knowledge, it was the duty of the steamer to slacken her speed on such a night, if not to have avoided the place altogether." Rogers v. The St. Charles, 19 How. [60 U. S.] 108. "If a vessel chooses to avail herself of a particular mode of going down the river at a particular time, which renders it difficult to escape collision, if a collision does take place she must bear the consequences of a contingency to which she has exposed herself." The Hope, 2 W. Rob. Adm. 8. "Nothing is better settled in the admiralty than that in dark and foggy nights measures of strict precaution are expected on the part of a master of a vessel in order to avoid chances of collision. However important it may be that voyages should be completed in the most speedy manner, such speed must be combined with safety to other vessels." Ang. Carr. § 648, and cases cited. In The Iron Duke, 9 Jur. 476, it was held that although the vessel injured carried no lights, properly so termed, "the steamer in going at full speed on such a night, in such a locality, and with only one man on the lookout, was improperly navigated, and therefore responsible for the whole damage." "Steam vessels, under such circumstances, are not justified by the English court of admiralty in going at the rate of ten knots an hour." Ang. Carr. § 650.

From these authorities it is manifest that the law exacts the extremest diligence and the highest degree of caution on the part of vessels, especially steamers, navigating frequented waters, where there is danger of collision; nor will it be any excuse that the collision could not have been prevented at the moment it occurred, if measures of precaution, which would have rendered the accident less probable, have been neglected. Ang. Carr. § 650. There can be no doubt that these rules apply with full force to a steamer engaged in towing. The tow has a right to expect of the tug at least as high a degree of diligence to prevent injuries to her, and to safely perform the service, as the steamer is bound to exercise in regard to other vessels. I proceed then to consider whether in this case the steamtug has been guilty of such negligence as will render her liable for the consequences of the collision, applying to the inquiry the same rules as would govern a similar inquiry if the collision had occurred between the tug and a stranger vessel. The tug appears to have taken hold of the schooner about 2 o'clock p. m., and about five miles outside the Heads. The tide was then ebb—but not long after, and probably when the vessels

were not far from Fort Point, the flood set in. About 7 o'clock the collision occurred. The schooner was thrown with great violence against the steamer Ajax, then at anchor in the harbor, striking the stern of the latter with her starboard side. If the Ajax had been struck by the tug, there can be no doubt that the latter would have been prima facie liable. "It may be assumed," says Mr. Justice Ware (The Scioto [supra]), "as a general rule, that when a collision takes place between a vessel under sail and one not under sail, the prima facie presumption is that the fault is imputable to the vessel in motion. [Smith v. Coudry] 1 How. [42 U. S.] 29. * * * Undoubtedly the rule must admit exceptions. But the first presumption will place the blame on her, because she has the power of changing her course, and a vessel at anchor is stationary. The vessel under sail must therefore clear herself from the imputation by showing that every practicable effort was made to avoid the collision." The same presumption must arise where the vessel in motion causes the craft she has in tow, and whose movements she controls, to collide with another vessel; nor is the case altered by the circumstance that the principal injury happens to fall upon the tow, and that it is she that is seeking compensation.

The claimants allege that soon after passing Meigg's wharf the master of the tug discovered a bark lying on his course; that the tug proceeded "slowly and cautiously" on her course, but went further into the stream to avoid the bark; that a fog, or haze, had settled on the water, and soon after she came "quite suddenly" upon a schooner without lights; that to avoid her the helm was put to port and the tug made a gentle sheer; that the schooner, in order to follow the tug, also put her helm to port, but did not meet her helm at the proper time; that as soon as the master of the tug discovered that the schooner was passing across his stern, and was going in a straight line, and head on to the Ajax, he ordered the helm of the tow hard a-starboard; that the schooner did not obey her helm readily, and that in consequence thereof she failed to clear the Ajax, and the collision occurred. It is further alleged that the schooner was loaded by the head; that she was short-handed, and her crew weak and worn down; that she was hogged, and steered badly, and that her master did not inform the tug of her condition. The answer also states that "against the ebb tide she steered well, but that in the slack water she steered wildly, sheering badly from side to side, but that it was then dark, and the master of the tug could not see how well or badly the schooner steered and he thought she had changed her man at the wheel." It is denied by the libelants that the schooner's helm was put to port to avoid a vessel without lights, or that she took any sheer whatever; and it is claimed that she was steered with the utmost care and attention, keeping a vigilant watch on the movements of the tug; that the vessel obeyed her helm, and her crew were abundantly able to perform every duty required of them.

The libelants charge that the tug was guilty of negligence in attempting to run through the shipping on a dark night with a vessel in tow by a line of fifty fathoms in length, and at a high and unsafe rate of speed. They also charge negligence on the part of the tug in not sooner taking measures to avoid the Ajax, and in not ordering the tow to starboard her helm until she herself had passed the bows of the Ajax, and was out of danger, while the tow was in a position that rendered the collision unavoidable. It is not easy to arrive at any accurate estimate of the speed of the vessels. The witnesses, of course, vary in their opinions; but from all that can be collected, it would seem to have been from seven to eight miles an hour. Whether this would be an unsafe rate of speed would depend upon the darkness of the night, the length of the hawser, the probability of meeting vessels, and all the circumstances of the case. If the night was as dark as is stated by Captain Neal, and even as may be inferred from the allegations of the answer, both the speed of the tug and the length of the tow line were too great. Captain Neal testifies that "it was very thick; you could hardly see a vessel more than a ship's length." The answer alleges that "it was then dark, and the master of the tug could not see how well or how badly the schooner steered." Captain Wilson, of the tug St. Thomas, states that he "should not consider it safe to run with the flood tide seven or eight miles an hour." Other witnesses express a contrary opinion, and Capt. Harrison ventures to say that "the greater the speed, the safer it is, up to the limit of speed which a tug can reach." In the case of The Rose, 2 W. Rob. Adm. 1, it was held that steamers are not justified in going at the rate of 10 miles an hour, on a dark night, and where other vessels are likely to be met. That the speed of the tug was greater than prudence justified would seem clear from the fact that she passed quite rapidly the tug Look Out, commanded by Capt. Neal, and also towing a vessel into the harbor. Capt. Neal testifies that she was going twice as fast as his own vessel. But the danger from her high rate of speed was greatly enhanced by the length of her tow line, especially if the night was as dark as appears from the answer. If the darkness or fog was so thick that the master of the tug could not see whether the tow steered well or ill, it may be inferred that the tow was at too great a distance to see the movements of the tug, and follow them by shifting her own helm. Both Capts. Neal and Wilson testify that it is unsafe to come up with a long hawser when the night is thick.

Capt. Smith states that he generally tows with a short hawser, 15 or 20 fathoms in length, until he gets below the shipping, and the significant fact appears in this case, and it is not disputed, that Capt. Neal, when he got near the shipping, did back down and shorten his hawser, thus proving by his conduct the sincerity of his opinion that it was a proper measure of precaution. If it were such, the neglect of it will render the tug liable for the consequences.

It may be urged, however, that the preponderance of testimony shows that the night was not so dark as to prevent the movements of the tug being seen from the tow, and that therefore the hawser was not too long. I am inclined to believe (though the answer seems to admit the contrary) that there was no difficulty in seeing the tug's lights from the tow, although the very close proximity of the schooner without lights at the moment she is said to have been discovered would seem to indicate that the night was far from clear. But I see no mode of reconciling with that "extreme caution" and that "utmost care" which the law exacts, the fact that the tug at so high a rate of speed, and with so long a hawser, took her course through, instead of inside or outside of, the shipping. On the inside was a fair way, 500 yards in width, established by harbor regulations; on the outside were the broad waters of the bay, where all danger would have been avoided. Capt. Neal, with his tow, passed outside of the shipping, and he observes, "There is no necessity to run through the shipping; it is dangerous, especially on a flood tide." That the tug in fact passed through the shipping cannot, I think, be doubted. It is not denied that several vessels were passed by the tug so near as barely to avoid them. Mr. Crabtree, first mate of the schooner, says that he passed within twenty, forty, and sixty yards respectively of three vessels. Espegreen, the schooner's helmsman, testifies that he crossed the bows of two other vessels, their jib-booms not more than five or six fathoms off; and Capt. Dresser, master of the schooner, says that after coming near a square-rigged vessel which they passed, he felt apprehensive of a collision. The schooner, without lights, is said to have been anchored somewhat to the outside of the Ajax, and about one-fourth of a mile below her. The master of the tug states that he passed to the inside of this schooner, and not more than fifty feet from her, and then endeavored to pass outside of the Ajax, which he succeeded in doing, clearing her by about forty yards, which the tow was unable to do.

It is evident, therefore, that the course of the tug was directed through the shipping, and under circumstances which required that her speed should be slackened and her hawser shortened, or else, in the language of the court in [Rogers v. St. Charles] 19 How. [60 U. S.] 108, "that the place should have been avoided altogether." The conjecture, for it is nothing more, of the master of the tug, that the tow ported her helm to avoid the schooner without lights, and thus got a sheer to starboard, which she was unable to overcome, is wholly unsupported by the testimony. Both the captain of the schooner and her helmsman deny that her helm was ported, or that she took a sheer to starboard. In fact, those on board the tug failed to see the schooner without lights in the position assigned to her by claimants' witnesses.

The allegations of the answer that the schooner's crew were worn down by labor and privation, that she was hogged, that she was not in trim, that she leaked, etc., seem either unsustained by the proofs or the facts testified to, are immaterial. That the schooner had been out of meat for about a week, and of bread for a few days, is clearly proven. She was also leaky, and perhaps a little out of trim. But when she was taken in tow by the tug she had no need of the services of her crew, except those of a competent helmsman and a vigilant lookout. The master appears to have been at much pains to have his vessel well steered. The helmsman was relieved about half an hour before the collision, because "he did not steer to the captain's satisfaction," and the wheel was taken by the master himself, who soon after resigned it to the second mate, who seems to have been thoroughly competent and attentive. The master then stationed himself as a lookout on the forward part of the deck-load, and maintained this position until the collision. He testifies that he observed the tug had put her helm to starboard, and was on the point of making the corresponding change in his own helm when the order to do so was given by the tug. This statement is corroborated by the testimony of Capt. Pierce, a passenger on the tug, who states that her helm was starboarded some two minutes before the order to do the like was given to the tow. Both the master and the mates testify that they were in full possession of their health and strength, and that they had heard no complaints from, and seen no sign of inability to work, in the crew. The leaky condition of the schooner, her being out of trim, or hogged, etc., are only important as tending to show that she did not steer well, and that she may have taken the sheer supposed by the claimants. But the master, the helmsman, and the mate deny most positively that she took any sheer whatever. If these witnesses are worthy of credit, their testimony as to what occurred on board their own vessel is more reliable than the suppositions of those on board the tug. The Neptune [Case No. 10,120]. The testimony establishes, I think, very clearly, that the schooner steered as well as is usual in vessels of her class. The captain, the first mate, the second mate, and Morse, all testify that she steered well. Some of the other seamen state that she steered badly in heavy

weather, but they generally admit that she steered well enough "if her helm was given to her quick, and she was close watched." Captain Pierce, a witness not certainly ill-disposed' to the claimants, testifies that he remarked, when coming up to the Heads, that the schooner steered very well. Captain Cameron, her ·former owner, testifies that her qualities in that respect were rather re-markable—"she was a little hogged, but it made no difference in her steering." Captain Shelly, a pilot who came up in the tug as far as Meiggs' wharf, says: "I paid no par-ticular attention to the steering of the schoon-er. If she had steered badly I should have noticed it." It is manifest from this testi-mony that the theory of the claimants that the schooner took a sheer which her helms-man was unable to meet, can derive no sup-port from the defects of the schooner in re-gard to her steering qualities.

It seems to me not difficult to discover from the allegations of the answer and the admit-ted facts of the case to whom the fault of the collision should be attributed. The an-swer admits that the tug came upon the schooner without lights "quite suddenly." She passed her within forty or fifty feet. The Ajax was then nearly dead ahead, and, as claimants aver, one-fourth of a mile dis-tant. The tug having passed inside the schooner, attempted to go on the outside of the Ajax, and for this purpose put her helm to starboard. But she did not communicate the corresponding order to the tow until two minutes afterward, nor until she had her-self passed the Ajax's bows. Notwithstand-ing her own early change in her helm, she passed the Ajax within 200 feet, or, as the captain admits, within forty or fifty yards. The order to the tow was promptly obeyed, but it was too late to avoid the accident. The tow could not then have been much further from the Ajax than the length of the tow line, and this with a flood tide setting her directly upon her. Under favorable circum-stances the course taken by the tug in and out among vessels, passing within forty or fifty feet of one and within 200 feet of an-other, would be attended with danger. But to take this course voluntarily. when she could have assured her own safety and that of her tow by passing either on the outside or the inside of all the shipping, and this on a night admitted to be somewhat hazy, at a considerable rate of speed, and with a tow line some forty-five or fifty fathoms in length, certainly betrays, as the result proved, a want of that "extreme vigilance" and ut-most care which the law exacted under the circumstances. I am therefore of opinion that the tug was in fault, and should be held responsible for the damages.

NOTE. In the original opinion at page 483, lines 47–50 from top, the language is: "Culbert-son v. The Southern Belle, 18 How. [59 U. S.] 585; The Scioto [Case No. 12,508]; Rogers v. The St. Charles, 19 How. [60 U. S.] 108; Ward

v. The Fashion [Case No. 17,154]: Ang. Carr. § 650." This is erroneous, and should be cor-rected so as to read: "Culbertson v. The South-ern Belle, 18 How. [59 U. S.] 585: The Scioto [supra]; Rogers v. The St. Charles, 19 How. [60 U. S.] 108; Newberry's R. 32 [Ward v. The Fashion, supra]; Ang. Carr. § 650."