[No. 23662.  *En Banc.*  January 16, 1933.]

GRAYS HARBOR COUNTY, *Appellant,* v. THE MOTORSHIP BRIMANGER *et al., Respondents.*

THE CITY OF ABERDEEN, *Appellant,* v. THE MOTORSHIP BRIMANGER *et al., Respondents.*[1]

[1] Reported in 18 P. (2d) 25.

*John C. Graham* and *E. E. Boner,* for appellants.
*Chas. A. Wallace,* for respondents.

BEALS, C. J.—Grays Harbor county and the city of Aberdeen, municipal corporations, owned and operated (under permit from the Federal government) several submarine cables crossing the Chehalis river a short distance above the point where the river flows into Grays Harbor. The cables were buried in the river bed at a point a little below the west bridge. Notices of the fact that cables crossed the river at that place were given by signs posted on the bridge.

During the month of December, 1929, the motorship Brimanger, a vessel of over 415 feet in length, 54 feet beam, 8,200 dead weight tons, drawing 11 feet of water forward and 18.70 feet aft, was lying at a dock on the north shore of the Chehalis river just west of the railroad bridge at Aberdeen. The ship's motors were out of commission, she was unable to move under her own power, and the master, desiring to move the vessel to a point up the river, advised the owner's agent at Aberdeen, whereupon the latter called upon Bar Pilots, Inc., to furnish a pilot to navigate the ship. To reach the new berth, it was necessary that the ship pass through the railroad bridge and the west bridge, which crosses the river a short distance upstream from the railroad bridge.

Captain Danielson, an experienced pilot, reported, and two tugs were also procured, the Tyhee, owned by the Allman-Hubble Tugboat Company, and the Tussler, owned by the R. J. Ultican Tugboat Company. The Tyhee was made fast to the bow and the Tussler at the stern, the master of the ship, Captain Rasmussen, together with Captain Danielson, the pilot, took post on the bridge, and the towing operations commenced. The ship was swung out into the stream and proceeded up

the river along the south side of the channel through the south draw span of the railroad bridge and towards the north draw span of the west bridge. The tide was slack, and the tow proceeded at from one to one and one-half knots per hour.

Upon approaching the open draw in the west bridge, the pilot observed that the tug was pulling the tow toward the bridge at an angle, and that collision between the ship and the bridge was probable. The tug was accordingly ordered to pull to port, which order was promptly obeyed, but before the change in direction could become effective, the tow had approached within striking distance of the bridge, and a collision was imminent. Some rapid conversation took place between the pilot and the master concerning the advisability of dropping the port anchor. The captain called attention to the fact that such action would be likely to cause damage to the buried cables, the exact location of which was well known both to the master and to the pilot.

It was, however, decided to drop the anchor (which weighed two and one-half tons), and an order to this effect was transmitted by the first officer, who was on the bridge, to the seaman who was in charge of the anchor windlass. The port anchor was promptly dropped, and fifteen fathoms of chain paid out. The ship dragged the anchor, as it was intended she should, the cables were torn loose, but the ship successfully negotiated the draw in the bridge.

Both the county and the city instituted suit against the ship, seeking to establish a lien thereon pursuant to Rem. Rev. Stat., § 1182, the county claiming damages in the sum of $2,500, the cost of repairing its cables, and the city in the sum of $592, representing the cost to it of necessary repairs required to place its cables again in operation. The sheriff of the county was

appointed temporary receiver for the vessel, whose owners appeared and deposited security for its release. The owners answered, their defense amounting practically to a general denial, no affirmative defense being pleaded. The actions were consolidated and tried to the court, resulting in findings in favor of the defendants and a judgment dismissing the action. From this judgment, plaintiffs have appealed.

██ Respondents contend that appellants are not entitled to recover, for the reason that the cables were not buried in the bed of the channel to a sufficient depth, and argue that the same were simply laid in the mud close to the surface of the bed of the stream. In support of their contention that the position of the cables bars appellants' right of recovery, respondents cite the case of *The City of Richmond,* 43 Fed. 85. The case cited involved the matter of the liability for damage occasioned both to cables and a ship, by reason of the striking of the cables by the ship's propellor. As the cables were struck by the ship itself, it is manifest that they may well have been held to be an interference with navigation, and an entirely different question was presented than that with which we are here concerned.

Examination of the evidence in the case before us as to the manner in which the cables were laid, satisfies us that they were laid properly and at a sufficient distance below the river bed. An anchor is constructed so that it will sink into mud, and a dropped anchor will sometimes penetrate to a great depth. One witness testified that he himself had removed anchors which had penetrated twenty feet of mud. It cannot reasonably be required that cables be buried deep enough to be secure from injury from dropped or dragging anchors. We are clearly of the opinion that it must be held from the evidence that the cables were properly

laid and placed a sufficient distance below the surface of the river bed.

This being true, the case turns upon the question of whose negligence occasioned the damage. Was the Brimanger navigating the Chehalis river in a negligent manner, was such negligence the proximate cause of the damages complained of, and is the ship responsible? The matter of the ultimate legal responsibility of the owners of the tugboats, or either of them, cannot be determined in this action, to which they are not parties. Appellants can recover herein only by proving by the legal quantum of evidence that the ship or its agent was negligent. Respondents may escape liability by the failure of appellants to prove their case, or by showing that the injury was the result of unavoidable accident.

The question of the responsibility for damage occasioned by a tow, under situations generally similar to that here presented, is one of difficulty. In 1 Parsons on Shipping and Admiralty, p. 534, the rule is stated as follows:

"The question has arisen, when a vessel is in tow of a steam-tug, and collision occurs with another vessel, which is responsible, the steam-tug or the vessel in tow? It is obvious that two perfectly distinct views may be taken of the relation between them. According to one, the vessel towing is but the servant of that which is towed; this latter is the master, and is responsible for the acts of the former as its servant. According to the other, the vessel towed is for the time under the absolute control of the vessel towing, and this latter is therefore responsible for any mischief done. We apprehend it to be an error to assume that either of these relations must exist in any particular case. The inquiry should always be, which party is the principal, and which the servant. And wherever the relation of principal and agent exists, the case should be decided on the principles of agency. Gener-

ally, we should say that the tug was probably the servant, and the vessel which employed her the principal, and responsible as such. But it will be seen that the cases are in irreconcilable conflict.''

As the circumstances surrounding the operations of a tugboat conducting a tow may vary greatly, we agree with the text cited in the principle laid down to the effect that each case must be considered in the light of its peculiar circumstances. We also agree with the text in the doctrine that, generally speaking, the tugboat should be considered the agent and the ship the principal. This is particularly true in a case such as this, where the captain and pilot were on the bridge and, to a considerable extent, actively participating in the navigation both of the ship and of the tugboat. A very different question would be presented in a case where the tug was pulling a tow entirely under the control of the tug.

As to what happened at the time of the accident, the master of the ship testified as follows:

''Q. Who was in charge of the ship at that time? A. I was the captain of the ship. . . . Q. Now then, just tell what was done by you as to moving the ship from that place. A. Well, we were going to move the ship from Anderson-Middletons to Bay City. Q. Where is Bay City? A. That is above the three bridges,—the railroad bridge, the west bridge and another bridge around the bend, just before you come to Bay City. Q. All right. A. At the time we had no power so had to hire two tug boats. Q. Something wrong with your power? A. Our engine was under repairs. Q. What did you do? A. We hired the tugs to take us through the bridges up to Bay City. Q. Just tell the court how you got those tugs? A. Through my agents Grays Harbor Stevedore. Our agents had certain orders and they called the pilot. We took off from the Anderson and Middleton Mill around six o'clock, at day time. You have to go up stream in day time. We passed the railroad bridge

and the first bridge and came through that and gave the signal for the next bridge to be open. The tug boat was towing the boat and we had lined up to pass through the west bridge. The tug boat ahead had too much speed on and the ship was heading right for the bridge. As we approached, or as we reached the bridge, about fifty feet from the bridge, I saw that we would collide with the bridge, if we kept the speed and course we did. They gave orders to the tug boat ahead to edge over. Q. Who gave that order? A. The pilot gave the order to the tug boat to edge the ship over to the port, or to the left, so as not to touch the bridge. The tug boat could not get over in time to swing the ship. To prevent colliding with the bridge we dropped our anchor and dragged the anchor and that swung us so we cleared the bridge. Q. Who gave the order to drop the anchor? A. The pilot did. Q. You had nothing to do with it? A. (Witness does not answer.) Q. What did you do, Captain, when the order was given to drop the anchor off the side anyway? A. I said, 'The cables.' 'Well, we will take the bridge in, let it down.' When I warned about the cables, he said, 'We will run down the bridge.' 'All right let it down.' The order was given to let the anchor down. . . . Q. State whether or not the tug boat, at the time you approached the bridge and after you were within say a hundred feet of it signaled a hundred feet out? A. It did not. Q. What did he do that was not signaling? A. He made a very bad maneuver. If he had been signaling,— Q. Go ahead. A. The tug was not signaling a hundred feet out and was very badly maneuvering. When we approached the bridge he had too much speed on and he put the ship right on to the bridge. He should have waited in order to get his order from the operator on the bridge until the ship was lined up for the opening of the bridge, but he did not. . . . Q. Anyhow, as you were approaching there he (the tug captain) did not tell you to drop the anchor, but he started to pull over towards the port side? A. He was told to do it. Q. Who was 'he'? A. The tug. Q. Who told him, you? A. The pilot. He was trying to get over. He had pulled so far on ahead,— Q. (Interrupting) Well,

then in your opinion you cannot say that he could not have succeeded? That he could not have succeeded in that? A. Well, clear in my judgment we could not clear that bridge. Q. Yes. A. It takes a little time for the tug boat to get over and I saw he was handling that so badly he would not have time to get the ship over. . . . Q. Of course, you are Master of the ship at all times? A. Yes, sir. Q. Your pilot is never Master of the ship? A. Yes, sir. Q. You are responsible always for that ship? A. I am always responsible for the ship. Q. Regardless of whether a pilot is there or not? A. Yes, sir."

Captain Danielson, the pilot, referring to the situation, testified as follows:

"Q. She (the ship) had no power? A. No. Q. How was she moved? A. By two tugs. Q. Who owned the tug that was at the bow and what was her name? A. The 'Tyhee,' owned by Hulbert (Hubble Tugboat Co.). Q. What tug was at the stern? A. The 'Tussel,' owned by the Ultican Tugboat Company. Q. You and these tugs were sent there to move that boat by the Bar Pilots Incorporated were you not? A. Yes, sir. Q. What happened after you got through the O. W. bridge? A. (Witness does not answer.) Q. Just tell the court now in your own way what happened? A. Well, the 'Tyhee' was pulling ahead and we did not make the turn quite quick enough. You know there are enough turns in that river there anyway. You have to be headed for the bridge, but you have to make that turn. You cannot make it going too fast. The captain and I were talking and he noticed we were headed for the bridge. We did not want to get the anchor out, but it was necessary to hit the bridge, or let go the anchor, so we decided to let go the anchor. Q. Now what happened there that made it necessary to let go the anchor? A. Well, we did not make the turn fast enough,—the ship did not make the turn fast enough. Q. You were in charge of the navigation were you? A. Yes, me and the master. . . . Q. What was the cause of this vessel heading into the bridge, Captain? . . . A. What is the cause?

Why, got her too close to the bridge. Q. Of her heading into the bridge? A. Well, there are several causes: She had no power, and the rudder is not very much effective on a ship that has not any power, and tidal conditions have something to do with it. She got too close to the bridge and the tug could not get her away from there in time, so that is how we let-go the anchor. Q. Did you give the tug any orders to go port? A. Yes. Q. When were those orders given? A. Oh, shortly before we let go of the anchor, but he could not get over in time and get it away from the bridge. . . . Q. If you had had her under her own power, you could have handled her better? A. Oh, yes. Q. In fact it is a little dangerous to pull,—tow ships around bridges anyhow? A. Well, you are taking certain forms of chances you do not take otherwise. Q. You are taking chances whenever you try to move a ship, without any power, for the reason it is quite impossible for the tug to handle it without some help from the ship? A. Oh, it is not impossible. It is done over and over again, but sometimes it does not operate right. Q. And it is dangerous to do? A. To a certain amount. Q. You prefer very much to have a ship have some of its own power on when you are piloting it? A. Yes."

The chief officer of the ship, after testifying that, in his opinion, the Brimanger would have struck the bridge unless the anchor had been dropped, and that orders were given for the tug to pull over, testified:

"Q. If you had given an order to the tug five or three minutes before that to pull you over, you would not have had to drop your anchor? A. Well, we had too much speed and she was headed right for the bridge. Q. But if you had given the orders a little sooner to pull over you would not have had to drop the anchor? A. No, but orders were not given."

Respondents contend that, from the evidence, it must be held that the tugs and the pilot were, in fact, in the exclusive possession and control of the navigation. It is true that the corporation, Bar Pilots, Inc., selected

the tugboats which were to operate the tow, but both the corporation and the pilot which it furnished were the agents and servants of the ship, and not the agents of the tugboats. The pilot became, in effect, the navigating officer of the ship for the time being, and he testified, as above quoted, that he and the master were in charge of the navigation, but it is clear that the master was, at all times, as he himself testified, responsible for the ship, regardless of whether or not a pilot was on board.

A pilot while in charge of a ship supersedes the master, in so far as the navigation of the vessel is concerned, but the master is at all times in command, and may and should advise with the pilot, and can displace him in case of intoxication or manifest incompetence. Any power of command exercised by the pilot is limited to the navigation of the ship. In the matter of *The Oregon,* 158 U. S. 186, the court quotes from an official report made by the British maritime commission in 1874, in which the Elder Brethren of Trinity House were said to have expressed the opinion

" '. . . that in well-conducted ships the master does not regard the presence of a duly licensed pilot in compulsory pilot waters as freeing him from every obligation to attend to the safety of the vessel; but that, while the master sees that his officers and crew duly attend to the pilot's orders, he himself is bound to keep a vigilant eye on the navigation of the vessel, and, when exceptional circumstances exist, not only to urge upon the pilot to use every precaution, but to insist upon such being taken.' Marsden on Collisions."

In 48 C. J. 1199, title "Pilots", § 64, the rule is laid down that

"While exercising his functions a pilot is in sole control of the navigation of the ship, and his orders must be obeyed as in effect orders of the master. But the master is still in command of the vessel, as

distinguished from its navigation, and may properly displace an obviously incompetent or intoxicated pilot, although he is not bound to do so unless the pilot is making an obvious mistake.''

In the same work, vol. 58, p. 274, title ''Shipping'', § 372, heading ''Management and Navigation of Vessel'', is found the following:

''The master has control of all departments of service on his ship, and full discretion as to its navigation. He must determine what is requisite for the safety of property and lives on his vessel. It is his duty personally to see to the course of his vessel, and to see that the officers and crew under him properly perform their assigned duties with respect to the navigation of the vessel. This rule applies in harbors or rivers, when for the time being a pilot is in charge of navigation and the pilot or other officer so in charge of navigation does not supersede the master in command. The master is responsible civilly and, under some statutes, criminally for any misconduct or neglect on his part.''

Respondents cite the case of *Societe Des Voilers Francais v. Oregon R. & Nav. Co.*, 178 Fed. 324, which was an action brought on behalf of the ship against a tugboat which had undertaken to move the ship out into the Willamette river. It appeared that the ship was in charge of two tugs, one attached to the port bow, the other to the port quarter. The captain of the latter tug (both tugs being owned by the same party) was in charge of the operation, and took the ship out into the stream rudder forward, the tug also having its bow downstream. Much drift was coming down the river, and an accident resulted by which the ship suffered damage. The court held that the tug was, under the circumstances shown, ''the dominant mind,'' and held the owner of the tugs liable for the damage suffered by the vessel. This was clearly correct. The acts which resulted in damage were the acts of the tug,

and the ship was purely "inanimate, without mind to direct its maneuvers or power to carry them on."

A very different situation is here presented. The Brimanger was not inanimate. According to the testimony of the pilot, she would, to some extent at least, respond to her rudder. Whether or not this is important, need not be considered, but she was not a dead weight in the sense that a barge is dead, nor in the sense that a ship being towed rudder foremost is inanimate. In the case at bar, it was the act of the ship, to-wit, the dropping of the anchor, that was the immediate occasion of the damage. The tugboat did not order the anchor dropped; that was done by the master and the pilot.

Respondent argues that these officers were the agents of the captain of the tugboat, but, under the circumstances of this case, we cannot hold that such was the case. Indeed, the ship was commanding the tug, as clearly appears from the testimony above quoted, to the effect that the ship had ordered the tug to turn to port. In the case at bar, and in so far as the situation now before us is concerned, the ship, not the tug, was the "dominant mind." The question of whether or not the owner of the tug is jointly liable to appellants or liable over to the ship, is not before us. If the danger of striking the bridge had been appreciated earlier, the tug would undoubtedly have been able to change the position of its tow and successfully navigate the channel (testimony of the chief officer of the ship, *supra*). The ship could see the danger better than the tug.

Respondents cite other authorities, among them *The Teaser*, 246 Fed. 219. This was a case involving the tow of a barge. The district court found, and its judgment was affirmed by the circuit court of appeals, that the barge was insufficiently manned and was improp-

erly steered. The circuit court of appeals, in the course of its opinion, said: "The fault of the Powel [the barge] was so glaring that it scarcely admits of discussion." In its opinion, the court refers to the principle that,

"In navigating a tow, the master of a barge in tow has no voice. *The Quickstep,* [76 U. S. 665] 9 Wall. 665, 19 L. Ed. 767. The tug is the dominant mind and will."

As above stated, in the case at bar, the ship exerted its own mind and will to an extraordinary degree, and notwithstanding the fact that the master and pilot knew the exact location of the cables, the ship's anchor was dropped to avoid what appeared to be the imminent probability of greater damage being occasioned by striking the bridge.

Respondents also cite the case of *Grays Harbor Tugboat Co. v. Petersen,* 250 Fed. 956. That was a case between a ship and the tug which undertook to tow it across the Grays Harbor bar. The captain of the tugboat, instead of following the regular channel, followed another course which he should have known was, under the circumstances, dangerous, and the owner of the tugboat was properly held liable to the ship for damages occasioned by the vessel striking upon the bar. In so far as the course followed by the tugboat is concerned, it is manifest that the tug was the dominant mind and in absolute control of the situation, a very different situation from that here presented.

Other authorities cited by respondents are of a similar nature. We are satisfied that the case disclosed by this record shows clearly a situation in which the tug was neither the dominant mind nor exercising exclusive control of the situation.

Referring to the liability of tug and tow, Hoffman,

District Judge, in the case of *Nelson v. The Goliah,* 17 Fed. Cas. 1319, lays down the following rule:

"Where both vessels are exclusively under the control, direction, and management of the master and crew of the tow, the owners of the tug would not be liable, for the injury could in no sense be said to be caused by the negligence and unskillfulness of themselves or their agents. Where those in charge of the vessels respectively jointly participate in their control and management, both will be liable if the damage was caused by the fault of both, or either, if it arose from his fault alone."

This position finds support in the cases of *In re Walsh,* 136 Fed. 557; *Sturgis v. Boyer,* 65 U. S. 110; and *The Civilta,* 103 U. S. 699.

In the matter of *The West Keats,* American Maritime Cases 1924, p. 1154, the circuit court of appeals for the ninth circuit held that, under the circumstances shown, the ship was in charge of the operation. The court states what, in its opinion, is the general rule, to the effect that,

". . . where a tug is employed by the master or owners of the tow as the mere motive power from one point to another, and both vessels are exclusively under the control, direction and management of a pilot not compulsorily employed by the master, fault will not be imputed to the tug, provided, always, the tug is properly equipped and seaworthy."

The case last cited arose between a tow and a tug, but even stronger reason exists for holding the ship liable in an action where the damage was suffered by a third party who was clearly nowise at fault.

As to the relative duties of the pilot and the master, it is the law that the pilot does not assume command of the ship. "No ship is large enough for two captains." Hughes on Admiralty (2d ed.), p. 36. The pilot becomes navigating officer, and the master should

not interfere unless it is plain that the pilot is reckless or incompetent, but the pilot is not in command in the sense that he supersedes the master. As to the liability of the ship for acts of the pilot, the rule is laid down by Mr. Hughes (p. 37) as follows:

"In one respect the decisions in relation to pilots run counter to common-law ideas on the subject of agency. It is a principle of the law of agency that the foundation of the master's responsibility for the acts of his agent is the right of selection and control. Yet the American courts hold that a vessel is responsible to third parties for injuries arising from the negligence of the pilot, though he came on board against the will of the master, under a state statute of compulsory pilotage.

"The English law was long different. But by Pilotage Act 1913, § 15, the ship is made liable, though in charge of a compulsory pilot.

"A pilot law is not considered compulsory, if the only penalty imposed is the payment of the pilotage fee.

"The reason why the vessel is held liable is that admiralty looks on the vessel itself as a responsible thing, and that under the ancient laws relating to pilots the responsibility was one which attached to the vessel itself, irrespective of ownership, it being thought unjust to require injured third parties to look beyond the offending thing to questions of ownership or control."

The fact that Bar Pilots, Inc., was a corporation and was requested to furnish a pilot, is entirely immaterial. The relations of Captain Danielson, the pilot who was furnished by the corporation, to the ship and the responsibility of the ship for his acts are no wise changed by the fact that he was in the employ of the corporation. Had the agent of the ship met a pilot on the street and instructed him to proceed to the ship and take her to her new berth, the situation would be exactly the same. It is clear that, considered as a ques-

tion of pilotage, the ship is responsible for the acts of the pilot in charge.

As above stated, the responsibility for damage, as between tug and tow, depends largely upon the peculiar circumstances of each case. This question generally arises as between the tug and the tow, but, of course, the books contain many cases in which the question arose, as here, between tug and tow on the one part and an entirely innocent bystander on the other. The question usually turns upon the matter of dominance of mind, depending upon whether the tug exercised complete control or whether that, or co-ordinate, authority was exercised from the tow.

"If the tow is towing at the end of a hawser, the liability would be upon the tug if the tow steered properly, and would be upon the tow if the proximate cause of the collision was wild steering on her part. Even if she was steering properly, and the tug steered her into danger, she would be responsible to the injured vessel if by changing her helm or taking any other reasonable precautions she could avoid the consequences of the tug's negligence, for it would be her duty to avoid collision if she could do so." Hughes on Admiralty (2d ed.), p. 129.

In the case at bar, no question is raised concerning the steering of the ship, although the anchor was dropped with the intention of changing the ship's direction and not with the idea of bringing her to an immediate stop.

In the matter of *The St. Charles,* 10 Fed. (2d) 924, decided by the circuit court of appeals for the second circuit, that court, adopting the opinion of the district judge, held both tug and tow liable for damage occasioned by the tow striking a ferry boat upon the parting of the hawser. A pilot was in charge of the ship, and was on the bridge with the master. The ship's agent had telephoned a towing company to send

a tug to the assistance of the ship, the towing company engaging the tug Barrett and later a second tug from another company. In the course of its opinion, the court said:

"No doubt the Barrett was expected to conduct the movement so far as the tugs were concerned generally, but the master's authority remained paramount. He must have understood this, because he says that, before clearing the stern of the Madison, he did check the Barrett's speed, and once ordered the Excelsior to go astern for that purpose, and he went full speed ahead, as we have seen, when the towing hawser parted. Whether he regarded the Barrett as in full control or not, he had the right and was under the duty of co-operating, and especially of using his engines, if circumstances required it."

In the case cited, the tugs in charge were engaged by a towing corporation, just as, in the case at bar, the tugs were engaged by Bar Pilots, Inc., but this fact nowise operated to release the ship from responsibility.

In the matter of *The City of Canton,* decided by the circuit court of appeals for the fifth circuit, 1925 American Maritime Cases 887, the owner of a ship sought to escape liability by pleading that, at the time of the accident, the ship was in charge of a pilot, the local law requiring that a pilot be placed in charge. In connection with the relative rights of master and pilot, the court says:

"The authority of the master of a vessel is not in complete abeyance while a pilot who is required by law to be accepted is in discharge of his functions. *The China,* 7 Wall. 53 [74 U. S. 53]. With reference to such a situation the following was said in the opinion in that case: 'It is the duty of the master to interfere in cases of the pilot's intoxication or manifest incapacity, in cases of danger which he does not foresee, and in all cases of great necessity. The master has

the same power to displace the pilot that he has to remove any subordinate officer of the vessel. He may exercise it or not, according to his discretion.' ''

As to the negligence of the master, the court says:

''A phase of the evidence furnished support for the inferences that the master of the *Atenas*, before that vessel reached a point in the river where its movements might affect the *City of Canton*, was aware that, under the direction of the pilot, it was being so operated that, without a change of its course or speed, it might cause a violent movement of a vessel situated as the *City of Canton* was; that he negligently failed to suggest to the pilot the danger which was disclosed and means of avoiding such danger; and that the master's negligence in failing to give timely admonition to the pilot proximately contributed to the injury complained of. We are of opinion that the evidence mentioned tended to prove conduct of the pilot, known to the master, giving rise to a case of danger or great necessity calling for the intervention of the master. A master of a vessel is not without fault in acquiescing in conduct of a pilot which involves apparent and avoidable danger, whether such danger is to the vessel upon which the pilot is or to another vessel or persons or property thereon or on shore.''

The situation presented in the case at bar is much like that discussed in the case cited, in so far as the responsibility of the master of the Brimanger for the dropping of the anchor is concerned. In the case at bar, the master understood that the pilot was suggesting the dropping of the anchor, and clearly acquiesced in the act, if he did not directly approve the same. In either event, it must be held that the anchor was dropped with his approval.

In the case of *United States v. Steamship San Pasqual*, 1927 American Maritime Cases 1208, the vessel was held liable for damages to a third party resulting from a collision, the tug being exonerated. In the opinion rendered by the district court, many

cases are considered, and the question of liability between tug and tow considered at length. The case supports our conclusion that the Brimanger is responsible. The cases of *The New Windsor*, 13 Fed. (2d) 925, and *Coello v. United States*, 9 Fed. (2d) 931, also support the conclusion which we reach in this case.

Respondents argue that the tugs were facilities of, and supplied by, Bar Pilots, Inc., a corporation, and were in the control of the pilot supplied by that corporation, and that the doctrine of independent contractor applies, with the result that respondents cannot be held liable for the injuries complained of. The record in this case discloses no such independent employment as could be held to constitute either Bar Pilots, Inc., or the tugboat companies independent contractors. In ordering tugs to the assistance of the ship, Bar Pilots, Inc., was acting simply as respondents' agent, and the pilot furnished became, for the time being, an officer of the ship performing special duties in connection with the navigation of the vessel to her new berth.

It is, of course, true that, in certain cases, the relation of tug to tow should be held to be that of independent contractor, and not that of agent and principal or employee and employer; but no such situation exists here. The fact that the bill of towage was made out on a billhead of Bar Pilots, Inc., is of little probative force, and has no weight against other positive testimony in the record as to the ownership of the tugs and their employment for the purpose of towing the ship up the river.

It is clear that, in ordering the tug to pull over and in directing the dropping of the anchor, the officers of the ship exercised, in their discretion, power of command and that dominance of mind which determines

the question of responsibility for the damages which are the subject matter of this action. It seemed to the pilot and to the captain probable that the ship, unless her course were changed, would strike the bridge, but it is not certain that it would have done so, particularly if the danger had sooner been anticipated. The dangerous situation could probably have been avoided by an earlier order to the tug to change its direction. Aided by the dragging anchor, the ship passed safely through the draw.

As far as the record shows, the captain of the tug was not aware that there was any imminent danger of collision between the ship and the bridge. Respondents' witnesses blamed the tug for the perilous situation in which the ship found herself, but the damage to the cables was the direct result of the acts of the ship, and we are satisfied that, under the authorities, it must be held that, for the damage resulting from the dropping of the anchor, the ship is liable. Her officers chose the lesser of two probable evils, and deliberately risked tearing up the cables rather than take the chance of hitting the bridge and causing infinitely greater damage. Whether considered as a question to be determined upon the law governing pilotage or tug and tow, the Brimanger is responsible to appellants for the damage to the cables.

The judgment appealed from is reversed, with directions to the trial court to enter judgment in favor of the appellants for the amounts claimed, concerning which there seems to be no dispute, in accordance with the statute applicable to such cases.

TOLMAN, STEINERT, and MAIN, JJ., concur.

HOLCOMB, J. (concurring in the result)—I concur in the result for the sole reason that, under the unconflicting evidence, the tugs were employed only as the

power to move the ship. The pilot and the tugs were all servants of the ship, nor was this compulsory pilotage *(The Oregon, supra)*. The master did not surrender command to the pilot *(The St. Charles, supra)*. Under such circumstances, the ship was in charge of the operation. Hence, the fault could not be imputed to the tugs *(The West Keats, supra)*.

MITCHELL, J. (dissenting)—I dissent. The question of responsibility for the damages occasioned in the towing of a ship, as between the vessel towing and the one towed, is often one of difficulty. Not necessarily because of conflict in the law on the subject, but rather a misunderstanding of, or failure to observe, the controlling facts as distinguished from conclusions of fact in each individual case.

In Hughes on Admiralty (2d Ed.), 125, the author says:

"The relation between tug and tow, under the American decisions, under ordinary circumstances, is that of independent contractor, not that of principal and agent. The tug is not the servant or employé of the tow, and therefore the tow is not responsible for the acts of the tug."

This text is quoted with approval in *The C. W. Mills,* 241 Fed. 204, affirmed 241 Fed. 378; 154 C. C. A. 651.

The application of the principle that each case must be considered in the light of its own peculiar circumstances, leads in this case to the inevitable conclusion that the ship in tow, its master or servants, were not the active or responsible cause of the damages. The trial court, in deciding the case, declared that no negligence was proven against the ship. His conclusion, as I understand the record, was that the accident was a mishap. It is held, however, by the majority opinion that the accident was the result of the ship's negli-

gence. Such a holding must, of course, be supported by a fair preponderance of the evidence.

Certain excerpts found in the testimony standing alone may appear to support the conclusions reached in the majority opinion, but, thus considered, they are contrary to the great weight of all the evidence and reasonable inferences therefrom. The master's statement that he had charge of the ship was not important, the proper inquiry being who had charge of operations or navigation in moving the ship. The master was first called as a witness by the appellant, and testified: "Q. Who was giving directions? A. The pilot was giving the directions." It is true he said that he hired the tugs through his agents. That was in the nature of a conclusion on his part, and contrary to the actual facts. He further testified that, as they approached the bridge, that is the bridge across the stream,

"They gave orders to the tug boat ahead to edge over. Q. Who gave that order to the tug boat ahead to edge over? A. The pilot gave that order to the tug boat to edge the ship over to the port or to the left so as not to touch the bridge."

To prevent a collision with the bridge across the stream, the pilot in charge gave the order "drop the anchor." I understand the remark of the master about "the cables" was not an attempt on his part to take control of operations, but simply an exclamatory caution.

Danielson, the pilot, after stating that the tugs were owned each by a different third person, gave this important testimony: "Q. *You and those tugs were sent there to move that boat by the Bar Pilots, Incorporated, were you not? A. Yes, sir.*" That is, he and the tugs were sent there by the Bar Pilots, Incorporated, not as servants and employees of and to help

the master to move the ship, but to move it themselves as servants of the Bar Pilots, Incorporated.

True, the pilot also testified: "Q. You were in charge of the navigation, were you? A. Yes, me and the master." But he was not a party to the contract, nor was there any testimony that he was even present when the ship's agent made the contract with Bar Pilots, Incorporated, nor that he knew anything of the terms of the contract. His answer by which the master was included was a polite expression or civility merely, else it was contrary to his other statement that he was sent there by the Bar Pilots, Incorporated, with the tugs to move the ship, and contrary to all other substantial, definite testimony in the case.

I cannot find in the testimony set out in the majority opinion, nor in all of the evidence in the record, that any order, direction or command was given by the master of the ship relative to the operations, nor by anyone other than the pilot employed and furnished by the Bar Pilots, Incorporated.

To assume, as it seems the majority opinion does, that the damage was occasioned by dropping the anchor *by order of the ship or master,* is not only not justified but is at variance with the master's testimony as follows: "Q. Who gave the order to drop the anchor? A. The pilot did." Later, under cross-examination by one of the appellants the master said: "Q. You stated, I believe, when you were approaching the bridge somebody said, 'Lower the anchor', was that you or the pilot? A. The pilot." That the pilot gave the order, I think, was uncontradicted.

There was no testimony tending to show that the ship, of itself, was other than inanimate, or that it took even a part in the act of towing. The pilot at one time, in testifying, rather incidentally referred to the

ship's rudder, but neither he nor anyone else testified that anyone was handling the ship's rudder, or that anyone was supposed to, while as to the power for towing, the ship furnished none of it.

The pilot testified:

"Q. Did the ship have any power? A. No. Q. What? A. She had no power. Q. She had no power? A. No. Q. How was she moved? A. By two tugs."

The engineer of the ship testified concerning the power of the ship at that time and said:

"Q. What, if any power did the 'Brimanger' have at that time? A. One of the auxiliary motors running. Q. What? A. One of the auxiliary motors running. Q. Did she have any power for travel,— for navigation? For navigation purposes? A. No, sir."

The chief officer of the ship testified that the *tug master* said: "I was just furnishing the power for the ship." The third mate of the ship, speaking of the occasion, testified: "Q. Were your engines going at the time? A. No. Q. Was there any power in the ship for navigation? A. No."

It may be safely said, in my opinion, that there was no division of power or responsibility in the navigation of the tow, the vessel being drawn by two tugs under the command of the pilot. Nor was there any evidence or fair inference from it that the position of the pilot on the ship, rather than on one of the tugs, was, of itself, proof that he was acting as a servant of the ship. It would seem that he was compelled, in all fair reason, to occupy that position in order to direct and control the two tugs, one at each end of the ship, with which he was working in towing the ship. There is other material testimony, some of which will be re-

ferred to later, and fair and necessary inferences from it, which together clearly negative any idea that either the Bar Pilots, Incorporated, the pilot or the tugs, either one or all, acted as agents or servants of the ship.

It is neither necessary nor practical to set out all the evidence as to the facts in this respect in the case. An examination of it convinces me that neither by direct terms nor reasonable inferences, nor by both, can it be gathered from the testimony that the master of the ship intended or accomplished the act of having its agent, the Grays Harbor Stevedoring Company, procure the services of another agent, the Bar Pilots, Incorporated, to engage two tugs in charge of a pilot chosen by the Bar Pilots, Incorporated, to act as servants of the master of the ship for the purpose of towing it. On the contrary, what actually happened was the master of the ship directed the Grays Harbor Stevedoring Company, which he says was the ship's shore agent, to arrange to have the ship towed, and that, accordingly, the agent employed the Bar Pilots, Incorporated, as a contractor to move the ship. The Bar Pilots, Incorporated, employed a tug from one owner and another from another owner and furnished a pilot, all as its servants, and sent them to tow the ship, which service they performed.

Neither the pilot nor either of the tugs or its owner made any charge to the master of the ship for services, manifestly because neither had rendered any for the ship or its master. On the contrary, the next day after the work was performed, the Bar Pilots, Incorporated, to which the ship was indebted, presented to the ship a bill or statement of its account for the total cost of the work, and which statement was approved by the master in writing, as follows:

"Aberdeen, Wash., Dec. 28, 1929
"MS Brimanger, Agents and Owners
        to BAR PILOTS, Inc., Dr.
        Grays Harbor Pilotage,
        Phone Abrdn 2657

Office
Foot of F St.                    Radio Call KZE

"PILOTAGE:

| | | |
|---|---|---|
| "Inward 3047 tons at | .02 | $60.94 |
| "14′ draft at | $1.50 | 21.00 |
| "Outward 3047 tons at | .02 | 60.94 |
| "19′ draft at | $1.50 | 28.50 |

"SHIFTING:

| | |
|---|---|
| "Donovan No. 1 to A. & M. | 25.00 |
| "A. & M. to A. L. & S. | 25.00 |
| "A. L. & S. to Bay City | No charge |

"TUG SERVICE:

"Assistance from Don. No. 1 to A & M
    2 tugs (No power)                 $75.00
."Assistance from A & M to AL&S
    2 tugs (No power)                 90.00
"Assistance from AL&S to Bay City
    2 tugs (No power)           no charge
"Assistance from Bay City thru bridges    30.00
"Approved: Bendt Rasmussen      Total—$416.38
           "Master."

The master testified that he endorsed his approval on the statement or bill presented by the Bar Pilots, Incorporated, and that he paid them.

No representative of the Grays Harbor Stevedoring Company, the ship's agent, testified at the trial. Thus, the statement presented to the ship becomes important as bearing upon the question of the relation existing between the ship and the Bar Pilots, Incorporated. The master referred to the statement or bill twice in testifying, once, over appellant's objections, in speak-

ing of the amount of the charges being customary in that community, and the second time, without any objection; in stating that he paid the bill.

The bill states an indebtedness of "MS Brimanger, Agents and Owners," not to the pilot or tugs, but to "Bar Pilots, Inc." The statement is itemized, about like that of a house builder, road contractor, or canal boat, not working under a lump sum bid. There was no charge for a pilot, that is a person, employed as a servant for the ship or her master; but the charge was for "pilotage" which, according to Webster, means "the act or business of piloting." Nor was there any charge for one or more tugs delivered to the ship for the use of her master or servants, but the charge was "tug service," another kind of act or business performed by the Bar Pilots, Incorporated, in carrying out and performing its contract with the ship.

The relation of the pilot and the tugs in the service of the Bar Pilots, Incorporated, to the ship was that of independent contractor, and the fact that the master of the ship, whose home in a limited sense was on the ship, was present during the performance of the contract, in no way altered that relation. There was not even any reservation on the part of the ship or its master to supervise the work in any manner.

In *Blacken v. Everett Bottling Works,* 137 Wash. 502, 242 Pac. 1102, the court said:

"The general rule is stated to our satisfaction in *Johnston v. Seattle Taxicab & Transfer Co.* 85 Wash. 551, 148 Pac. 900, as follows:

" 'The general rule is that an independent contractor is one who renders services to another in the course of an independent occupation, representing the will of his employer only as to the result of the work and not as to the means by which it is accomplished; the chief consideration being that the employer has no right to control as to the mode or manner of doing the work;

but a reservation by the employer of the right to supervise the work for the purpose of determining whether it is being done in accordance with the contract does not affect the independence of the relation.' 14 R. C. L. 70."

Instead of the evidence preponderating in support of the charge of negligence against the ship, it is altogether the other way, in my opinion. The ship was passive.

The judgments appealed from should be affirmed.

PARKER and MILLARD, JJ., concur with MITCHELL, J.

